## GOSA *v.* MAYDEN, WARDEN

No. 71–6314.   Argued December 4, 1972—Decided June 25, 1973.*

---

*Together with No. 71–1398, *Warner, Secretary of the Navy* v. *Flemings*, on certiorari to the United States Court of Appeals for the Second Circuit.

BLACKMUN, J., announced the Court's judgments and delivered an opinion, in which BURGER, C. J., and WHITE and POWELL, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgments, *post*, p. 692. DOUGLAS, J., filed an opinion concurring in the result in part in No. 71–6314, and concurring in the result in No. 71–1398, *post*, p. 686. STEWART, J., filed an opinion concurring in the result in No. 71–1398, in which DOUGLAS, J., joined, and dissenting in No. 71–6314, *post*, p. 693. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in which STEWART, J., joined as it applies to No. 71–6314, *post*, p. 693.

*Solicitor General Griswold* argued the cause for petitioner in No. 71–1398 and for respondent in No. 71–6314. With him on the briefs in both cases were *Assistant Attorney General Petersen, Deputy Solicitor General Lacovara, William Bradford Reynolds,* and *Roger A. Pauley. John R. Saalfield* argued the cause for petitioner in No. 71–6314. On the brief was *H. Franklin Perritt, Jr.*

*Michael Meltsner,* by appointment of the Court, 408 U. S. 919, argued the cause and filed a brief for respondent in No. 71–1398.†

MR. JUSTICE BLACKMUN announced the judgments of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE WHITE, and MR. JUSTICE POWELL join.

In *O'Callahan* v. *Parker,* 395 U. S. 258, decided June 2, 1969, this Court, by a 5–3 vote, held that when a person in military service is charged with a crime that is not "service connected," *id.,* at 272, the defendant is entitled, despite his military status, to the benefit of "two important constitutional guarantees," *id.,* at 273,

---

†*Rowland Watts* filed a brief for the Workers Defense League as *amicus curiae* urging reversal in No. 71–6314 and affirmance in No. 71–1398.

namely, indictment by a grand jury [1] and trial by jury in a civilian court.

The Court noted that O'Callahan was "properly absent from his military base when he committed the crimes with which he is charged," *ibid.;* that there was no connection between his military duties and the crimes; that the offenses were committed off the military post or enclave; that the victim was not performing any duty relating to the military; that the situs of the crimes was not occupied territory or under military control; that they were peacetime offenses; that the civilian courts were open; and that the offenses involved no question of the flouting of military authority, post security, or the integrity of military property.

Later, in *Relford* v. *Commandant,* 397 U. S. 934 (1970), we granted certiorari "limited to retroactivity and scope of *O'Callahan* v. *Parker.*" When *Relford* was decided, 401 U. S. 355 (1971), we held that an offense committed on a military post by an individual in service, in violation of the security of another person or property on that post, was "service connected," within *O'Callahan's* language. Relford's offenses so qualified. His case, thus, went off on the scope of *O'Callahan* and did not reach the issue of retroactivity. We concluded that the latter issue, although having "important dimensions, both direct and collateral," was "better resolved in other litigation where, perhaps, it would be solely dispositive of the case." *Id.,* at 370. One of the cases, *Gosa,* now before us presents that issue solely. The other case, *Flemings,* presents the issue, but not solely.

---

[1] The Court, of course, has not yet held the indictment requirement of the Fifth Amendment to be binding upon the States. *Hurtado* v. *California,* 110 U. S. 516 (1884); *Gaines* v. *Washington,* 277 U. S. 81, 86 (1928); *Branzburg* v. *Hayes,* 408 U. S. 665, 688 n. 25 (1972).

I

*No. 71–6314.* In December 1966 petitioner James Roy Gosa, an airman third class, stationed at Warren Air Force Base in Wyoming, was tried by a court-martial and convicted of rape, in violation of Art. 120 of the Uniform Code of Military Justice, 10 U. S. C. § 920.

The offense took place the preceding August, in what the respondent has stated to be peacetime,[2] when Gosa was in the city of Cheyenne. At the time, he was officially off duty and absent from the base on authorized leave. He was not in uniform. The victim was not connected with the military or related to military personnel. Shortly after the incident Gosa was arrested by civilian authorities. He was unable to make bond and was detained pending a preliminary hearing. The complaining witness did not appear at the hearing. Gosa, accordingly, was released. He was taken into military custody, however, and charged with the Art. 120 violation. A general court-martial was convened. Gosa was tried and convicted. He was sentenced to 10 years' imprisonment at hard labor, forfeiture of pay and allowances, reduction in rank to the lowest pay grade of airman basic, and a bad conduct discharge. As required by Art. 61 of the Code, 10 U. S. C. § 861, the convening authority then referred the case to his staff judge advocate for review. The staff judge advocate's recommendation that the findings and sentence of the general court-martial be approved were adopted by the convening authority. Pursuant to Art. 66 of the Code, 10 U. S. C. § 866, the case was referred to an Air Force Board of Review. That Board affirmed the conviction and sentence. On August 16, 1967, the United States Court of Military Appeals denied a petition for review. 17 U. S.

---

[2] Tr. of Oral Arg. 16.

C. M. A. 648. The case thereupon became final, Art. 76 of the Code, 10 U. S. C. § 876, subject, of course, to the habeas corpus exception recognized in *United States* v. *Augenblick,* 393 U. S. 348, 349–350 (1969).

At no time throughout the trial and the review proceedings did Gosa raise any question as to the power of the military tribunal to try him.

Following the Court's decision in *O'Callahan,* Gosa filed an application for a writ of habeas corpus in the United States District Court for the Northern District of Florida seeking his release from the Federal Correctional Institution at Tallahassee where he was then confined.[3] Subsequently, he filed with the United States Court of Military Appeals a motion to vacate his sentence and conviction; this was treated as a petition for reconsideration and was denied by a divided vote with accompanying opinions. 19 U. S. C. M. A. 327, 41 C. M. R. 327 (1970). The habeas application also was denied by the District Court upon its determination that the standards promulgated in *Stovall* v. *Denno,* 388 U. S. 293, 297 (1967), and related cases, precluded retroactive application of *O'Callahan.* 305 F. Supp. 1186 (ND Fla. 1969). On appeal, in the face of a Government concession that the alleged offense was not service connected, the Court of Appeals for the Fifth Circuit, one judge dissenting, affirmed. 450 F. 2d 753 (1971).

*No. 71–1398.* In 1944, when the United States was formally at war, respondent James W. Flemings, then age 18 and a seaman second class, was stationed at the Naval Ammunition Depot in New Jersey. On August 7 of that year Flemings failed to return on time from an

---

[3] Gosa has since been released. Inasmuch as the District Court possessed federal habeas jurisdiction when Gosa's application was filed, that jurisdiction was not defeated by his release prior to the completion of proceedings on the application. *Carafas* v. *LaVallee,* 391 U. S. 234, 238–240 (1968).

authorized three-day leave. He was apprehended by Pennsylvania police while he was in an automobile stolen two days earlier in Trenton, New Jersey. Flemings was turned over to military authorities. He was charged with unauthorized absence from his duty station during wartime and with theft of an automobile "from the possession of . . . a civilian." [4]

A court-martial was convened at the Brooklyn Navy Yard. Flemings, represented by a reserve lieutenant, pleaded guilty to the two charges. He was sentenced to three years' imprisonment, reduction in rank to apprentice seaman, and dishonorable discharge. After two years' confinement he was released and was dishonorably discharged in October 1946.

In 1970, Flemings instituted suit in the United States District Court for the Eastern District of New York, relying on O'Callahan and seeking to compel the Secretary of the Navy to overturn the 1944 court-martial conviction for auto theft and to correct his military records with respect to the dishonorable discharge. He did not challenge the validity of his conviction for being absent without leave.

The District Court held that the auto theft offense was not service connected in the O'Callahan sense and that O'Callahan was to be applied retroactively to invalidate the court-martial conviction on that charge. 330 F. Supp. 193 (1971). The Court of Appeals for the Second Circuit affirmed. 458 F. 2d 544 (1972).

We granted certiorari in both cases to resolve the conflict. 407 U. S. 920 and 919 (1972).[5]

---

[4] It appears that the automobile was owned by a member of the Signal Corps but that the car was being used by him on a purely personal errand when it was stolen. The owner was not compensated by the military for its use.

[5] See also *Schlomann* v. *Moseley,* 457 F. 2d 1223 (CA10 1972), cert. denied, *post,* p. 919; *Thompson* v. *Parker,* 308 F. Supp. 904, 907–908 (MD Pa.), appeal dismissed (No. 18868, CA3 1970); and

## II

*O'Callahan* v. *Parker,* to use the words MR. JUSTICE STEWART employed in *Desist* v. *United States,* 394 U. S. 244, 248 (1969), was "a clear break with the past." In *O'Callahan* the Court concluded that, in harmonizing

---

*Mercer* v. *Dillon,* 19 U. S. C. M. A. 264, 265, 41 C. M. R. 264, 265 (1970), where the Court of Military Appeals confined the application of *O'Callahan* to those convictions that were not final when *O'Callahan* was decided on June 2, 1969.

Scholarly comment on *O'Callahan* retrospectivity is divided. The following predict or favor nonretroactivity: Everett, *O'Callahan* v. *Parker*—Milestone or Millstone in Military Justice?, 1969 Duke L. J. 853, 886–889; Nelson & Westbrook, Court-Martial Jurisdiction Over Servicemen for "Civilian" Offenses: An Analysis of O'Callahan v. Parker, 54 Minn. L. Rev. 1, 39–46 (1969); Note, Military Law-Constitutional Law-Court-Martial Jurisdiction Limited to "Service-Connected" cases, 44 Tulane L. Rev. 417, 423–424 (1970); Note, RETROACTIVITY-Military Jurisdiction-Military Convictions for Nonservice-Connected Offenses Should Be Vacated Retroactively, 50 Tex. L. Rev. 405 (1972); Note, CONSTITUTIONAL LAW-Retroactivity of *O'Callahan* v. *Parker,* 47 St. John's L. Rev. 235 (1972); Note, The Sword and Nice Subtleties of Constitutional Law: *O'Callahan* v. *Parker,* 3 Loyola U. (L. A.) L. Rev. 188, 198 n. 67 (1970); Comment, Courts Martial-Jurisdiction-Service-Connected Crime, 21 S. C. L. Rev. 781, 793–794 (1969). The following predict or favor retroactivity: Blumenfeld, Retroactivity After O'Callahan: An Analytical and Statistical Approach, 60 Geo. L. J. 551 (1972); Wilkinson, The Narrowing Scope of Court-Martial Jurisdiction: *O'Callahan* v. *Parker,* 9 Washburn L. J. 193, 197–201 (1970); Higley, O'Callahan Retroactivity: An Argument for the Proposition, 27 JAG J. 85, 96–97 (1972); Note, *O'Callahan* v. *Parker,* A Military Jurisdictional Dilemma, 22 Baylor L. Rev. 64, 75 (1970); Note, Denial of Military Jurisdiction over Servicemen's Crimes Having No Military Significance and Cognizable in Civilian Courts, 64 Nw. U. L. Rev. 930, 938 (1970). See Birnbaum & Fowler, *O'Callahan* v. *Parker:* The *Relford* Decision and Further Developments in Military Justice, 39 Ford. L. Rev. 729, 739–742 (1971).

A compilation of general comments on *O'Callahan* appears in *Relford* v. *Commandant,* 401 U. S. 355, 356 n. 1 (1971).

the express guarantees of the Fifth and Sixth Amendments, with respect to grand jury indictment and trial by a civilian jury, with the power of Congress, under Art. I, § 8, cl. 14, of the Constitution, "To make Rules for the Government and Regulation of the land and naval Forces," a military tribunal ordinarily may not try a serviceman charged with a crime that has no service connection. Although the Court in *O'Callahan* did not expressly overrule any prior decision, it did announce a new constitutional principle, and it effected a decisional change in attitude that had prevailed for many decades. The Court long and consistently had recognized that military status in itself was sufficient for the exercise of court-martial jurisdiction. *Kinsella* v. *Singleton,* 361 U. S. 234, 240–241, 243 (1960); *Reid* v. *Covert,* 354 U. S. 1, 22–23 (1957); *Grafton* v. *United States,* 206 U. S. 333, 348 (1907); *Johnson* v. *Sayre,* 158 U. S. 109, 114 (1895); *Smith* v. *Whitney,* 116 U. S. 167, 184–185 (1886); *Coleman* v. *Tennessee,* 97 U. S. 509 (1879); *Ex parte Milligan,* 4 Wall. 2, 123 (1866). Indeed, in *Grafton,* 206 U. S., at 348, the Court observed, "While . . . the jurisdiction of general courts-martial extends to all crimes, not capital, committed against public law by an officer or soldier of the Army within the limits of the territory in which he is serving, this jurisdiction is not exclusive, but only concurrent with that of the civil courts."

The new approach announced in *O'Callahan* was cast, to be sure, in "jurisdictional" terms, but this was "lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,' as used in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers" (footnote omitted). 395 U. S., at 272–273. The Court went on to emphasize that the "power of Congress to make 'Rules for the Government and Regu-

lation of the land and naval Forces,' Art. I, § 8, cl. 14, need not be sparingly read in order to preserve those two important constitutional guarantees. For it is assumed that an express grant of general power to Congress is to be exercised in harmony with express guarantees of the Bill of Rights." *Id.*, at 273. The basis for the "jurisdictional" holding in *O'Callahan* obviously was the increasing awareness and recognition of the important constitutional values embodied in the Fifth and Sixth Amendments. Faced with the need to extend the protection of those Amendments as widely as possible, while at the same time respecting the power of Congress to make "Rules for the Government and Regulation of the land and naval Forces," the Court, *id.*, at 265, heeded the necessity for restricting the exercise of jurisdiction by military tribunals to those crimes with a service connection as an appropriate and beneficial limitation "to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Toth* v. *Quarles,* 350 U. S. 11, 22 (1955).

That *O'Callahan* dealt with the appropriate exercise of jurisdiction by military tribunals is apparent from *Kinsella* v. *Singleton, supra,* where the Court ruled that the Necessary and Proper Clause, Art. I, § 8, cl. 18, does not enable Congress to broaden the term "land and naval Forces" in Art. I, § 8, cl. 14, to include a civilian dependent accompanying a member of the Armed Forces overseas. In such a case, it was held, a civilian dependent is entitled to the safeguards of Art. III and of the Fifth and Sixth Amendments, and conviction by court-martial is not constitutionally permissible:

> "But the power to 'make Rules for the Government and Regulation of the land and naval Forces' bears no limitation as to offenses. The power there

granted includes not only the creation of offenses but the fixing of the punishment therefor. If civilian dependents are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses. This Court cannot diminish and expand that power, either on a case-by-case basis or on a balancing of the power there granted Congress against the safeguards of Article III and the Fifth and Sixth Amendments. Due process cannot create or enlarge power. . . . It deals neither with power nor with jurisdiction, but with their exercise." 361 U. S., at 246.

Although the decision in *O'Callahan* emphasizes the difference in procedural protections respectively afforded by the military and the civilian tribunals, the Court certainly did not hold, or even intimate, that the prosecution in a military court of a member of the Armed Services for a nonservice-connected crime was so unfair as to be void *ab initio*. Rather, the prophylactic rule there formulated "created a protective umbrella serving to enhance" a newly recognized constitutional principle. *Michigan* v. *Payne*, 412 U. S. 47, 54 (1973). That recognition and effect are given to a theretofore unrecognized and uneffectuated constitutional principle does not, of course, automatically mandate retroactivity. In *Williams* v. *United States*, 401 U. S. 646, 651 (1971), MR. JUSTICE WHITE made it clear, citing *Linkletter* v. *Walker*, 381 U. S. 618 (1965), that the Court has "firmly rejected the idea that all new interpretations of the Constitution must be considered always to have been the law and that prior constructions to the contrary must always be ignored." See *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371, 374 (1940). And in *Johnson* v. *New Jersey*, 384 U. S. 719, 728 (1966),

it was said that "the choice between retroactivity and nonretroactivity in no way turns on the value of the constitutional guarantee involved."

*Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968), are illustrative of the context of the *O'Callahan* decision. In *Duncan,* the Court held that since "trial by jury in criminal cases is fundamental to the American scheme of justice, . . . the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee" (footnote omitted). 391 U. S., at 149. In *Bloom* the Court held that serious criminal contempts may not be summarily punished and that they are subject to the Constitution's jury trial provision. 391 U. S., at 201–210. In those two cases the Court ruled that a state court exercising jurisdiction over a defendant in a serious criminal or criminal contempt case, but failing to honor a request for a jury trial, in effect was without jurisdiction. Yet in *DeStefano* v. *Woods,* 392 U. S. 631 (1968), the Court by a *per curiam* opinion, denied retroactive application to those new constitutional holdings. The Court thus concluded that it did not follow that every judgment rendered in a *Duncan* or in a *Bloom* situation, prior to the decisions in those cases, was so infected by unfairness as to be null and void.

The same analysis has pertinent application to these very similar cases, and it leads us to the conclusion that the validity of convictions by military tribunals, now said to have exercised jurisdiction inappropriately over non-service-connected offenses is not sufficiently in doubt so as to require the reversal of all such convictions rendered since 1916 when Congress provided for military trials for civilian offenses committed by persons in the Armed Services. Act of Aug. 29, 1916, c. 418, 39 Stat. 652.

The clearly opposing and contrasting situation is provided by the argument made by respondent Flemings to the effect that the retroactivity of *O'Callahan* is to be determined and is controlled by *United States* v. *U. S. Coin & Currency,* 401 U. S. 715 (1971). In that case the Court held that its decisions in *Marchetti* v. *United States,* 390 U. S. 39 (1968), and *Grosso* v. *United States,* 390 U. S. 62 (1968), precluding the criminal conviction of a gambler who properly asserted his Fifth Amendment privilege against self-incrimination as a reason for his failure to register and to pay the federal gambling tax, would be applied retroactively so as to invalidate forfeiture proceedings under 26 U. S. C. § 7302 ensuing upon the invalid conviction. To suggest that *Coin & Currency* is controlling is to ignore the important distinction between that case and these. There the Court determined that retrospective application of *Marchetti* and *Grosso* was required because they "dealt with the kind of conduct that cannot constitutionally be punished in the first instance," 401 U. S., at 723; it was conduct "constitutionally immune from punishment" in any court. *Id.,* at 724.

In *O'Callahan,* on the other hand, the offense was one for which the defendant was not so immune in any court. The question was not whether O'Callahan could have been prosecuted; it was, instead, one related to the forum, that is, whether, as we have said, the exercise of jurisdiction by a military tribunal, pursuant to an act of Congress, over his nonservice-connected offense was appropriate when balanced against the important guarantees of the Fifth and Sixth Amendments. The Court concluded that in the circumstances there presented the exercise of jurisdiction was not appropriate, and fashioned a rule limiting the exercise of court-martial jurisdiction in order to protect the rights to indictment and jury trial. The Court did not hold that a military

tribunal was and always had been without authority to exercise jurisdiction over a nonservice-connected offense.

## III

The foregoing conclusion, of course, does not end our inquiry as to whether *O'Callahan* should be accorded retroactive application.

In two cases decided earlier this Term, retrospectivity of a new constitutional decision was also an issue. *Robinson* v. *Neil,* 409 U. S. 505 (1973), concerned successive municipal and state prosecutions for alleged offenses arising from the same circumstances, and a claim of double jeopardy, based on this Court's intervening decisions in *Benton* v. *Maryland,* 395 U. S. 784 (1969), and *Waller* v. *Florida,* 397 U. S. 387 (1970). We recognized that in *Linkletter* the Court was "charting new ground" in the retrospectivity area, 409 U. S., at 507, that *"Linkletter* and succeeding cases," *ibid.,* obviously including *Stovall* v. *Denno,* 388 U. S., at 297, established standards for determining retroactivity; that *Robinson,* however, did not readily lend itself to the *Linkletter* analysis; that *Linkletter* and its related cases dealt with procedural rights and trial methods; and that guarantees not related to procedural rules "cannot, for retroactivity purposes, be lumped conveniently together in terms of analysis." *Robinson* v. *Neil,* 409 U. S., at 508.

In *Michigan* v. *Payne,* 412 U. S. 47 (1973), we were concerned with the retroactivity of *North Carolina* v. *Pearce,* 395 U. S. 711 (1969), and the standards it promulgated with respect to an increased judge-imposed sentence on retrial after a successful appeal. We there employed the *Stovall* criteria and held that *Pearce* was not to be applied retroactively.

In the present cases we are not concerned, of course, with procedural rights or trial methods, as is exemplified by the decisions concerning the exclusionary rule (*Link-*

*letter*), the right of confrontation (*Stovall*), adverse comment on a defendant's failure to take the stand (*Tehan* v. *Shott,* 382 U. S. 406 (1966)), and a confession's admissibility (*Johnson* v. *New Jersey,* 384 U. S. 719 (1966)). But neither are we concerned, as we were in *Robinson,* with a constitutional right that operates to prevent another trial from taking place at all. Our concern, instead, is with the appropriateness of the exercise of jurisdiction by a military forum.

These cases, therefore, closely parallel *DeStefano* v. *Woods, supra,* where the Court denied retroactive application to *Duncan* v. *Louisiana, supra,* and *Bloom* v. *Illinois, supra,* in each of which a right to a jury trial had been enunciated. In denying retroactivity, the integrity of each of the earlier proceedings, without a jury, was recognized. The test applied in *DeStefano* was the *Stovall* test. 392 U. S., at 633–635. Similarly here, then, the three-prong test of *Stovall* has pertinency, and we proceed to measure Gosa's and Flemings' claims by that test directed to "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." 388 U. S., at 297.

A. *Purpose.* "Foremost among these factors is the purpose to be served by the new constitutional rule." *Desist* v. *United States,* 394 U. S. 244, 249 (1969). In his opinion for the plurality in *Williams* v. *United States,* 401 U. S., at 653, MR. JUSTICE WHITE emphasized that where "the major purpose of new constitutional doctrine is to overcome" a trial aspect "that substantially impairs its truth-finding function," the new rule is given complete retroactive effect, and "[n]either good-faith reliance" nor "severe impact on the administration of justice" suffices to require prospectivity.

Our initial concern, therefore, is whether the major purpose of the holding in *O'Callahan* was to overcome an aspect of military trials which substantially impaired the truth-finding process and brought into question the accuracy of all the guilty verdicts rendered by military tribunals. At the same time, however, the fact that a new rule tends incidentally to improve or enhance reliability does not in itself mandate the rule's retroactive application. The Court in *Johnson* v. *New Jersey,* 384 U. S., at 728, repeated what had been suggested in *Linkletter* and *Tehan,* that "we must determine retroactivity 'in each case' by looking to the peculiar traits of the specific 'rule in question' " and

> "[f]inally, we emphasize that the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree. . . . We are thus concerned with a question of probabilities and must take account, among other factors, of the extent to which other safeguards are available to protect the integrity of the truth-determining process at trial." 384 U. S., at 728–729.

See *Michigan* v. *Payne,* 412 U. S., at 55. Thus, retroactivity is not required by a determination that the old standard was not the most effective vehicle for ascertaining the truth, or that the truth-determining process has been aided somewhat by the new standard, or that one of several purposes in formulating the new standard was to prevent distortion in the process.

Although the opinion in *O'Callahan* was not uncritical of the military system of justice, and stressed possible command influence and the lack of certain procedural safeguards, 395 U. S., at 263–266, the decision there, as has been pointed out above, certainly was not based on any conviction that the court-martial lacks fundamental

integrity in its truth-determining process.[6]  Indeed, our subsequent ruling in *Relford* itself indicates our conclusion that military criminal proceedings are not basically unfair, for *Relford* clearly approves prosecution in a military court, of what is otherwise a civilian crime, when factors are present that establish the offense's "service connection."  401 U. S., at 364–365.  See Mr. Chief Justice Warren's paper, The Bill of Rights and the Military, 37 N. Y. U. L. Rev. 181, 188–189 (1962).

It, of course, would demean the constitutional rights to indictment and trial by a jury to assert that those guarantees do not play some role in assuring the integrity of the truth-determining process.  "[T]he right to jury trial generally tends to prevent arbitrariness and repression." *DeStefano* v. *Woods,* 392 U. S., at 633.  The same mission is fulfilled by the indictment right.  But a policy directed at the prevention of arbitrariness and repression is not confined to the truth-determining process.  It is concerned, as well, with a larger range of possible evils: prosecution that is malicious, prosecutorial overzealousness, excessiveness of sentence, and the like.  These very ingredients were also present in the back-

---

[6] There are some protections in the military system not afforded the accused in the civilian counterpart.  For example, Art. 32 of the Code, 10 U. S. C. § 832, requires "thorough and impartial investigation" prior to trial, and prescribes for the accused the rights to be advised of the charge, to have counsel present at the investigation, to cross-examine adverse witnesses there, and to present exonerating evidence.  It is not difficult to imagine, also, the situation where a defendant, who is in service, may well receive a more objective hearing in a court-martial than from a local jury of a community that resents the military presence.

The Uniform Code of Military Justice was not in effect when Flemings was charged and pleaded guilty.  But the fact that his proceeding took place under the present Code's predecessor is no inevitable indication of basic unfairness.  See *Burns* v. *Wilson,* 346 U. S. 137 (1953).

ground in *Duncan* and *Bloom*. Yet, the Court did not find it necessary to hold retroactive the rights newly established by those cases.

Nothing said in *O'Callahan* indicates that the major purpose of that decision was to remedy a defect in the truth-determining process in the military trial. Rather, the broad guarantees of the Fifth Amendment right to grand jury indictment and the Sixth Amendment right to jury trial weighed heavily in the limitation of the exercise of court-martial jurisdiction to " '*the least possible power adequate to the end proposed,*' " *Toth* v. *Quarles,* 350 U. S. 11, 23 (1955), a phrase taken from *Anderson* v. *Dunn,* 6 Wheat. 204, 231 (1821).

The purpose behind the rule enunciated in *O'Callahan* thus does not mandate retroactivity.

B. *Reliance.* With respect to this factor, we repeat what has been emphasized above, namely, that, before *O'Callahan,* the law was settled that the exercise of military jurisdiction over an offense allegedly committed by a member of the Armed Forces was appropriately based on the military status of the defendant and was not dependent on the situs or nature of the offense. There was justifiable and extensive reliance by the military and by all others on the specific rulings of this Court. Military authorities were acting appropriately pursuant to provisions of the Uniform Code of Military Justice, Art. 2, 10 U. S. C. § 802, and its predecessors, and could not be said to be attempting to usurp civilian authority. The military is not to be faulted for its reliance on the law as it stood before *O'Callahan* and for not anticipating the "clear break with the past" that *O'Callahan* entailed. The reliance factor, too, favors prospectivity.

C. *Effect on the Administration of Justice.* In *DeStefano* v. *Woods,* 392 U. S., at 634, the Court, in considering the retroactivity of *Duncan* and *Bloom,* at-

tached special significance to the fact that "the effect of a holding of general retroactivity on law enforcement and the administration of justice would be significant, because the denial of jury trial has occurred in a very great number of cases." The very same factor is present with like significance here, for the military courts have been functioning in this area since 1916, appropriately assuming from this Court's successive holdings, that they were properly exercising jurisdiction in cases concerning nonservice-connected offenses allegedly committed by servicemen.

A mere glance at the reports of the United States Court of Military Appeals discloses the volume of prosecutions in military tribunals. Retrospective application of *O'Callahan* would not only affect the validity of many criminal convictions but would result in adjustments and controversy over back pay, veterans' benefits, retirement pay, pensions, and other matters. In addition, the task of establishing a service connection on the basis of a stale record or in a new trial would prove formidable if not impossible in many cases, since at the time the record was made the question whether there was a service connection was of no importance.

Gosa and Flemings press upon us a recent law review article. Blumenfeld, Retroactivity After O'Callahan: An Analytical and Statistical Approach, 60 Geo. L. J. 551 (1972). The author of that article concludes: (1) On the basis of a sampling of cases reviewed by the Court of Military Appeals and the Army Court of Military Review between June 2, 1969 (the date of *O'Callahan*), and December 31, 1970, only about 1% of the general court-martial cases were service connected. *Id.,* at 580 n. 147. (2) "[V]ery few" servicemen have sought collateral review of their convictions since *O'Callahan* was decided. *Id.,* at 578 n. 141. The author asserts, however: "Even if the number of requests for relief sent

to military departments should exceed expectations, the Defense Department, with an abundance of personnel and computers, could develop procedures to insure a quick review." *Id.*, at 572. (3) The military has necessary machinery to process claims and petitions for review. *Id.*, at 571–575. (4) The financial impact of a ruling of retroactivity would not be great since most servicemen convicted of nonservice-connected crimes would not be entitled to retirement or pension pay and, in any event, the average return should not exceed $1,500. *Id.*, at 574–575.

In *Mercer* v. *Dillon,* 19 U. S. C. M. A. 264, 41 C. M. R. 264 (1970), the United States Court of Military Appeals, a tribunal composed of civilian judges, 10 U. S. C. § 867, but uniquely familiar with the military system of justice, spoke in another vein.[7] A pertinent factor, too, is that

[7] "We recognize that not all the persons possibly entitled to review and relief would have the initiative or a sufficient financial interest to justify the time and expense of bringing suits or applications. A reliable estimate of the number of court-martial convictions that could be overturned by a retroactive application of *O'Callahan* is nearly impossible to secure. For the one fiscal year of 1968, the Army, the Navy, and the Air Force conducted approximately 74,000 special and general courts-martial. If only the smallest fraction of these courts-martial and those conducted in the other years since 1916 involved an *O'Callahan* issue, it is an understatement that thousands of courts-martial would still be subject to review. The range of relief could be extensive, involving such actions as determinations by the military departments of whether the character of discharges must be changed, and consideration of retroactive entitlement to pay, retired pay, pensions, compensation, and other veterans' benefits. Among the difficulties would be the necessity of reconstructing the pay grade that a member of the armed forces would have attained except for the sentence of the invalidated court-martial, a task complicated by the existence of a personnel system involving selection of only the best qualified eligibles and providing for the elimination of others after specified years of service." 19 U. S. C. M. A., at 267–268, 41 C. M. R., at 267–268.

until Flemings' case emerged in the Second Circuit, the civilian and the military courts had ruled against applying *O'Callahan* retroactively; thus there was no decisional impetus to encourage litigation.

We must necessarily also consider the impact of a retroactivity holding on the interests of society when the new constitutional standard promulgated does not bring into question the accuracy of prior adjudications of guilt. Wholesale invalidation of convictions rendered years ago could well mean that convicted persons would be freed without retrial, for witnesses, particularly military ones, no longer may be readily available, memories may have faded, records may be incomplete or missing, and physical evidence may have disappeared. Society must not be made to tolerate a result of that kind when there is no significant question concerning the accuracy of the process by which judgment was rendered or, in other words, when essential justice is not involved.

We conclude that the purpose to be served by *O'Callahan,* the reliance on the law as it stood before that decision, and the effect of a holding of retroactivity, all require that *O'Callahan* be accorded prospective application only. We so hold.[8]

## IV

Flemings also urges that, because his court-martial proceeding was convened in Brooklyn, whereas the auto theft took place in New Jersey and his arrest in Pennsylvania, he was deprived of the right to a trial in the vicinage, as guaranteed by Art. III, § 2, cl. 3, of the

---

[8] In Flemings' case, the Secretary argues, in the alternative, that *O'Callahan* does not require the invalidation of the auto theft conviction because the offense was committed while the respondent was absent without leave during wartime. For that reason, it is said, the offense was service connected under the rationale of *Relford*. In view of our holding on the issue of retroactivity, we do not reach, and need not resolve, this alternative argument.

Constitution. This claim was not raised before the military court. Moreover, a military tribunal is an Article I legislative court with jurisdiction independent of the judicial power created and defined by Article III. *Ex parte Quirin,* 317 U. S. 1, 39 (1942); *Whelchel* v. *McDonald,* 340 U. S. 122, 127 (1950); *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 165 (1963). General court-martial jurisdiction is not restricted territorially to the limits of a particular State or district. 1 W. Winthrop, Military Law and Precedents 104–105 (2d ed. 1896). And the vicinage requirement has primary relevance to trial by jury. In any event, Flemings has demonstrated no prejudice.

The judgment in No. 71–6314 is affirmed; that in No. 71–1398 is reversed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring in the result in part in No. 71–6314 and concurring in the result in No. 71–1398.

I agree with MR. JUSTICE STEWART that respondent Flemings committed a "service connected" crime.[1]

As to the *Gosa* case I think the case should be put down for reargument on whether *res judicata* controls the disposition of the case. The argument that it does goes as follows:

Petitioner Gosa was tried for rape before a military tribunal and convicted. The case went through the hierarchy of review within the military establishment and after the conviction and sentence were affirmed, a

---

[1] In the *Flemings* case respondent in time of war went AWOL and stole a car from a civilian. The military charge against him was an unauthorized absence from his duty station during wartime and theft of a car from a civilian. He pleaded guilty; and the only action brought came years later when he sought correction of his military records.

petition for review was filed with the Court of Military Appeals (a civilian court created by Congress); but that court denied review.[2]   The events described took place in 1966 and 1967.   On June 2, 1969, we decided *O'Callahan* v. *Parker,* 395 U. S. 258, invalidating the court-martial conviction for rape committed off the military base by a serviceman who was on leave.

*O'Callahan* in that respect is on all fours with the instant case, for here petitioner was officially off-duty, in civilian clothes, and was found to have raped a civilian in no way connected with the military, while he was in Cheyenne, Wyoming, near Warren Air Force Base but not on the base.

*O'Callahan* was decided in 1969 and in reliance on it petitioner Gosa started this habeas corpus action [3] seeking

---

[2] The Uniform Code of Military Justice, after providing for investigation before a charge is referred to a general court-martial in Art. 32 (a), goes on to state in Art. 32 (b):

"The accused shall be advised of the charges against him and of his right to be represented at that investigation by counsel.   Upon his own request he shall be represented by civilian counsel if provided by him, or military counsel of his own selection if such counsel is reasonably available, or by counsel detailed by the officer exercising general court-martial jurisdiction over the command.   At that investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf, either in defense or mitigation, and the investigating officer shall examine available witnesses requested by the accused.   If the charges are forwarded after the investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides and a copy thereof shall be given to the accused."   10 U. S. C. § 832 (b).

Petitioner had counsel before the Court of Military Appeals, one designated by the Army; and only "the merits" of the conviction were raised, no question being raised relating to the "jurisdiction" of the military.

[3] Title 10 U. S. C. § 876 provides that military review of court-martial convictions shall be "final and conclusive" and "binding upon

release from his confinement under the military sentence.

The question whether one of our constitutional decisions should be retroactively applied has been before us on numerous occasions. *Linkletter* v. *Walker,* 381 U. S. 618; *Stovall* v. *Denno,* 388 U. S. 293, 297; *Desist* v. *United States,* 394 U. S. 244; *DeStefano* v. *Woods,* 392 U. S. 631.

But in all cases to date which involved retroactivity the question has been whether the court whose judgment is being reviewed should be required in the interests of substantial justice to retry the accused under the new constitutional rule announced by the Court after the first trial had been completed but before the new constitutional

---

all . . . courts . . . of the United States." As we noted in *United States* v. *Augenblick,* 393 U. S. 348, 349–350, relief by way of habeas corpus is an exception to that finality clause.

It was suggested by the Solicitor General in his brief in opposition to a motion for leave to file a petition for writ of certiorari in *Crawford* v. *United States,* 380 U. S. 970, that while the statutes made the judgment of the Court of Military Appeals "final and conclusive," habeas corpus would be available to a person confined and a writ of error *coram nobis* in the District Court if he is not confined; citing 25 U. S. C. § 1254 (c) (probably intending 28 U. S. C. § 1254 (1)); *Hiatt* v. *Brown,* 339 U. S. 103, 106 n. 1. In that view one who was unsuccessful in obtaining relief by way of *coram nobis* in the district court, would be able to seek review in the court of appeals and ultimately by certiorari in this Court. That question was not resolved by this Court, since we denied certiorari in the *Crawford* case. In the *Crawford* case the question tendered on the merits was whether the restriction of court-martial membership to senior noncommissioned officers, excluding entire classes of statutorily eligible prospective court-martial members, deprived petitioner of due process and violated 10 U. S. C. § 825 so as to deprive the court-martial of jurisdiction. For the decision of the Court of Military Appeals see *United States* v. *Crawford,* 15 U. S. C. M. A. 31, 35 C. M. R. 3. And see Schiesser, Trial by Peers: Enlisted Members on Courts-Martial, 15 Cath. U. L. Rev. 171 (1966).

decision was announced. The measure applied as to whether the new rule should be prospective or retroactive[4] was the three-pronged test stated in *Stovall* v. *Denno, supra,* at 297: "The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

Here the question is whether a civilian, rather than a military, tribunal should have tried him. Does the question whether the "jurisdiction"[5] of the military tribunal can be contested at this late date turn on whether *res judicata* bars that inquiry?

Petitioner Gosa in the review of his conviction by the military tribunal never raised the question raised in *O'Callahan.*[6] If he was "constitutionally immune from punishment" in any court, we would have the problem presented in *United States* v. *U. S. Coin & Currency,* 401 U. S. 715, 723–724. But petitioner was not tried by a

---

[4] The Court of Military Appeals decided that *O'Callahan* v. *Parker* would be applied only to those convictions that were not final before the date of that decision. *Mercer* v. *Dillon,* 19 U. S. C. M. A. 264, 41 C. M. R. 264 (1970).

[5] For purposes of habeas corpus, historically used to test the "jurisdiction" of tribunals to try defendants, the concept has been broadened to include constitutional guarantees. Thus in *Johnson* v. *Zerbst,* 304 U. S. 458, compliance with the constitutional mandate that an accused is entitled to counsel was held to be "an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty." *Id.,* at 467. The rule announced used "jurisdiction" in an innovative way with the purpose of giving counsel to defendants who up to the time of our decisions in *Gideon* v. *Wainwright,* 372 U. S. 335, and *Argersinger* v. *Hamlin,* 407 U. S. 25, had no lawyers to represent them and thus were commonly deprived of their constitutional rights.

[6] See n. 2, *supra.*

kangaroo court or by eager vigilantes but by military authorities within the framework established by Congress in the Uniform Code of Military Justice.

The case is somewhat unlike *McClaughry* v. *Deming,* 186 U. S. 49, where a court-martial was constituted of officers of the regular army who by an Act of Congress were not authorized to sit in judgment on volunteers. The court-martial was held incompetent to sit on the case because it acted in plain violation of an Act of Congress. There was therefore no tribunal authorized by law to render the challenged judgment. Consent to be so tried could not confer jurisdiction in face of the mandate of the statute. In the present cases Congress by express provisions of the Code had authorized the military tribunals to sit in these types of cases.

In *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371, municipal debts were readjusted by a federal district court under an Act of Congress which this Court later held to be unconstitutional. The latter ruling was in *Ashton* v. *Cameron County District,* 298 U. S. 513, where a closely divided Court held that an extension of the Bankruptcy Act to include a readjustment of the debts of municipalities and counties was unconstitutional. Petitioner had its debts readjusted under that Act, which permitted less than all of the outstanding bondholders to agree to a plan. That plan was consummated before the *Ashton* decision. Respondent was one of the nonconsenting bondholders. After the *Ashton* decision it brought suit on its bonds. The question before the Court in the *Chicot County Drainage District* case was the extent to which the *Ashton* case should be made retroactive. The Court, speaking through Mr. Chief Justice Hughes, said that the proceedings in the District Court "were conducted in complete conformity to the statute" and that "no question had been raised as to the regu-

larity of the court's action." 308 U. S., at 375. Since the parties had an opportunity to raise the question of invalidity but did not do so, they "were not the less bound by the decree because they failed to raise it." *Ibid.* Mr. Chief Justice Hughes added, *id.*, at 377:

> "Whatever the contention as to jurisdiction may be, whether it is that the boundaries of a valid statute have been transgressed, or that the statute itself is invalid, the question of jurisdiction is still one for judicial determination. If the contention is one as to validity, the question is to be considered in the light of the standing of the party who seeks to raise the question and of its particular application."

He went on to say, *id.*, at 378:

> "[*R*]*es judicata* may be pleaded as a bar, not only as respects matters actually presented to sustain or defeat the right asserted in the earlier proceeding, 'but also as respects any other available matter which might have been presented to that end.' *Grubb* v. *Public Utilities Comm'n*, [281 U. S. 470, 479]."

Petitioner claims, as did respondent in the *Chicot County Drainage District* case, that the tribunal that first adjudicated the cause acted unconstitutionally. At the time the military court acted, however, it was assumed to have "jurisdiction" and its "jurisdiction" was in no way challenged in the review proceedings available to petitioner. Did the issue of "jurisdiction" for that case therefore become *res judicata?*

These are, in brief, the reasons why *res judicata* arguably should lead to an affirmance in the *Gosa* case. Contrary to intimations in the dissenting opinion I have reached no position on the merits and would reserve judgment until the issue was fully explored on reargument.

Mr. Justice Rehnquist, concurring in the judgments.

I do not believe that decisions of this Court would support a holding that the rule announced in *O'Callahan* v. *Parker*, 395 U. S. 258 (1969), should not be applied retroactively to court-martial convictions entered before the decision in that case. In *O'Callahan*, the Court clearly held that courts-martial did not have jurisdiction to try servicemen for "non-service connected" crimes. For substantially the reasons stated by my Brother Marshall, I believe that *Robinson* v. *Neil*, 409 U. S. 505 (1973), and prior decisions mandate that *O'Callahan* be applied retroactively.

In No. 71–6314, since I believe that the *O'Callahan* rule could not in any event be given only prospective application, the question arises whether the analytical inquiry sanctioned by that decision should even be undertaken. *O'Callahan*, was, in my opinion, wrongly decided, and I would overrule it for the reasons set forth by Mr. Justice Harlan in his dissenting opinion. 395 U. S., at 274–284.

In No. 71–1398, even if *O'Callahan* were followed, I agree with the views of my Brother Stewart. The offense was committed during a period of declared war, and furthermore while respondent was absent without official leave from his military duties. For purposes of the "service connected"—"non-service connected" dichotomy announced by *O'Callahan*, I would hold that any crime committed by a member of the Armed Forces during time of war is "service connected," and that he can validly be tried by a court-martial for that offense. Cf. *Relford* v. *Commandant*, 401 U. S. 355 (1971).

I therefore concur in the judgments of the Court, and would affirm the judgment of the Court of Appeals in No. 71–6314 and reverse that in No. 71–1398.

MR. JUSTICE STEWART, dissenting in No. 71–6314, *Gosa* v. *Mayden,* and, joined by MR. JUSTICE DOUGLAS, concurring in the result in No. 71–1398, *Warner* v. *Flemings.*

I dissented in *O'Callahan* v. *Parker,* 395 U. S. 258, 274 (1969), and continue to believe that that case was wrongly decided. Until or unless *O'Callahan* is over-ruled, however, I think it must be given fully retro-active application for the reasons stated in my Brother MARSHALL's persuasive dissenting opinion, *post,* this page. Accordingly, I join his dissenting opinion as it applies to No. 71–6314, *Gosa* v. *Mayden.*

But that view, in my opinion, does not dispose of No. 71–1398, *Warner* v. *Flemings.* I think that a service-man who deserts his post during a time of congressionally declared war and steals an automobile is guilty of a "service connected" offense. Accordingly, I conclude that the respondent Flemings was properly tried before a court-martial under *O'Callahan.* Cf. *Relford* v. *Commandant,* 401 U. S. 355, 365 (1971). For this reason I concur in the result reached by the Court in the *Flemings* case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEWART* join, dissenting.

## I

MR. JUSTICE BLACKMUN's plurality opinion, by its efforts to establish that *O'Callahan* v. *Parker,* 395 U. S. 258 (1969), was not a decision dealing with jurisdic-tion in its classic form, implicitly acknowledges that if *O'Callahan* were in fact concerned with the adjudicatory

---

*MR. JUSTICE STEWART joins this opinion only as it applies to No. 71–6314. See *ante,* this page.

power—that is, the jurisdictional competency [1]—of military tribunals, its holding would necessarily be fully retroactive in effect, cf. *e. g., Linkletter* v. *Walker,* 381 U. S. 618, 623 (1965). The plurality now puts forth the view that *O'Callahan* was not concerned with the true jurisdictional competency of courts-martial but that the decision yielded merely a new constitutional rule. This characterization of *O'Callahan* permits the plurality to apply in this case the three-prong test employed to judge the retroactivity of new procedural rules under *Linkletter* and its progeny, see, *e. g., Desist* v. *United States,* 394 U. S. 244, 249 (1969); *Stovall* v. *Denno,* 388 U. S. 293, 297 (1967). And, not surprisingly, application of that test leads to the conclusion that *O'Callahan* should have only prospective effect. With all due respect, I must dissent.

I am unable to agree with the plurality's characterization of *O'Callahan.* In my view, it can only be understood as a decision dealing with the constitutional limits of the military's adjudicatory power over offenses committed by servicemen. No decision could more plainly involve the limits of a tribunal's power to exercise jurisdiction over particular offenses and thus more clearly demand retroactive application.

## A

In holding that *O'Callahan* is to be given only prospective effect, the plurality does not reject outright the view that the decision was jurisdictional in nature. Yet it clearly does reject the contention that *O'Callahan* dealt with a question of true jurisdictional competency, for we are told that the decision "did announce a new constitutional principle," *ante,* at 673, and that it really "dealt with the appropriate exercise of jurisdiction

---

[1] See generally Restatement of Judgments § 7, comments at 41–46 (1942).

by military tribunals," *ante,* at 674. The difference between a decision concerning a tribunal's jurisdictional competency—that is, the limits of its adjudicatory power—and "the appropriate exercise of [its] jurisdiction" is less than clear to me, at least where, as here, the question of "appropriateness" ultimately turns on the extent of Congress' constitutional authority under Art. I, § 8, cl. 14, to "make Rules for the Government and Regulation of the land and naval Forces." But whatever the nature of the distinction that the plurality now seeks to draw, it cannot, in my opinion, obscure the essential character of the decision in *O'Callahan.*

*O'Callahan* required this Court to define the class of offenses committed by servicemen that Congress, under Art. I, § 8, cl. 14, could constitutionally empower military tribunals to try. The nature of the ultimate inquiry there is plain from the question upon which the Court granted certiorari: " 'Does a court-martial, held under the Articles of War, Tit. 10, U. S. C. § 801 *et seq.,* have jurisdiction to try a member of the Armed Forces who is charged with commission of a crime cognizable in a civilian court and having no military significance, alleged to have been committed off-post and while on leave, thus depriving him of his constitutional rights to indictment by grand jury and trial by a petit jury in a civilian court?' " 395 U. S., at 261. The *O'Callahan* Court's discussion of this issue was consistently couched in terms of the jurisdiction of military tribunals; [2] and, in dissent, Mr. Justice Harlan, too, framed the issue presented in the unmistakable terms of "the appropriate subject-matter jurisdiction of courts-martial," *id.,* at 276. Even the Court of Appeals in No. 71-6314, while ultimately holding the *O'Callahan* decision to be prospective only, acknowledged that the decision turned upon a determination of "lack of adjudicatory power"—that *"O'Cal-*

---

[2] See 395 U. S., at 265, 267, 269, 272.

*lahan*'s foundation, framework and structure deny to the legislation which breathed the breath of judicial life into the forum that tried Sgt. O'Callahan, the necessary basis in constitutional power to reach his type of case." [3] 450 F. 2d 753, 757 (CA5 1971). See also *United States ex rel. Flemings* v. *Chafee,* 458 F. 2d 544, 549–550 (CA2 1972).

Despite the evident jurisdictional nature of the ultimate issue presented in *O'Callahan,* the plurality attempts to analogize this case to *DeStefano* v. *Woods,* 392 U. S. 631 (1968), where the Court held that the decisions in *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Bloom* v. *Illinois,* 391 U. S. 194 (1968), were to have only prospective effect. *Duncan* held that the Sixth Amendment guarantee of trial by jury in criminal cases had been made applicable to the States by the Fourteenth Amendment. And *Bloom* established the right to jury trial in the context of serious criminal contempt proceedings. *DeStefano*—like the other offspring of *Linkletter* that have applied the three-prong test to determine retroactivity—involved constitutional rulings that established new procedures for the conduct of trial or for the use of evidence. But *O'Callahan* hardly was such a case.

The Court in *O'Callahan* was not setting forth procedures which the military was constitutionally required to adopt in its proceedings. Had the Court been doing so, this would certainly be a different case; the analogy

---

[3] In *Relford* v. *Commandant,* 401 U. S. 355, 356 (1971), MR. JUSTICE BLACKMUN, speaking for the Court, described the *O'Callahan* decision as follows:

"In *O'Callahan* . . . , by a five-to-three vote, the Court held that a court-martial may not try a member of our armed forces charged with attempted rape of a civilian, with housebreaking, and with assault with intent to rape, when the alleged offenses were committed off-post on American territory, when the soldier was on leave, and when the charges could have been prosecuted in a civilian court."

to *DeStefano* then might well be appropriate. It is true, as the plurality now points out, that the *O'Callahan* Court placed considerable emphasis on the lack of jury trial in the court-martial system. But it did so only as a part of the general analytic process of determining the proper reconciliation of the competing jurisdictions of two essentially distinct[4] judicial systems, namely, the civil and military systems of justice. The Court's basic concern in this process was the preservation—to the fullest extent possible consistent with the legitimate needs of the military—of the fundamental civil rights guaranteed by our Constitution and Bill of Rights. Those civil rights were, in the Court's words, the "constitutional stakes in the . . . litigation." *O'Callahan* v. *Parker, supra,* at 262.

Thus, the Court pointed out that one tried before a military tribunal is without the benefit of not only trial by jury but also indictment by a grand jury. *Ibid.* Nor are the same rules of evidence and procedure applicable in a military proceeding, a factor affecting, for example, the defense's access to compulsory process, *id.,* at 264 n. 4. In addition, the Court was concerned with the fact that the presiding officers at courts-martial do not enjoy the independence that is thought to flow from life tenure and undiminishable salary. To the contrary, the Court recognized that "the possibility of influence on the actions of the court-martial by the officer who convenes it, selects its members and the counsel on both sides, and who usually has direct command authority over its members is a pervasive one in military law, despite strenuous efforts to eliminate the danger." *Id.,* at 264. In short, the Court con-

---

[4] A serviceman convicted by a court-martial does, of course, ultimately have access to the federal judicial system by way of a petition for federal habeas corpus. See, *e. g., Burns* v. *Wilson,* 346 U. S. 137 (1953); *Gusik* v. *Schilder,* 340 U. S. 128 (1950).

cluded that "[a] court-martial is not yet an independent instrument of justice but remains to a significant degree a specialized part of the overall mechanism by which military discipline is preserved," *Id.*, at 265.

The Court's purpose in considering these factors was not to require changes in the military system of justice, but rather to illustrate its "fundamental differences from . . . the civilian courts," *id.*, at 262, differences that compelled the Court " 'to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service,' " *id.*, at 265, quoting from *Toth* v. *Quarles,* 350 U. S. 11, 22 (1955). As a result, the Court concluded that the "crime to be under military jurisdiction must be service connected . . . ," 395 U. S., at 272, so that the power of Congress under Art. I, § 8, cl. 14, to "make Rules for the Government and Regulation of the land and naval Forces," and also the exemption from the grand jury requirement of the Fifth Amendment for "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger" are not expanded to deprive servicemen unjustifiably of their civil rights.[5] The Court found that when an offense is not service

---

[5] Indeed, even if the military voluntarily elected to provide servicemen on trial before courts-martial with the full panoply of procedural rights constitutionally required in civil forums, that would not affect the decision in *O'Callahan.* Implicit in *O'Callahan* is the fact that the military system of justice has never been understood to be constitutionally compelled to provide many of the procedural rights afforded by the civilian courts, and thus it would always remain free to provide only that which is constitutionally necessary. It was with an understanding of what is constitutionally required, not of what the military might elect to provide, that the scope of Congress' power under Art. I, § 8, cl. 14, had to be, and was, defined in *O'Callahan,* see 395 U. S., at 261–262. It is this fact that perhaps best demonstrates the true jurisdictional—as opposed to procedural— nature of that decision.

connected, the needs of the military are not significantly implicated and thus that the limits of Congress' constitutional power over servicemen under Art. I, § 8, cl. 14, have been passed, at least in the context of "peacetime offenses," 395 U. S., at 273.

Certainly the jurisdictional nature of the *O'Callahan* decision is amply demonstrated by this Court's previous decision in *McClaughry* v. *Deming*, 186 U. S. 49 (1902). There the Court was called upon to decide "the power of an officer convening a court-martial for the trial of an officer of volunteers [reserve troops], to compose that court entirely of officers of the Regular Army." *Id.*, at 53. The Court determined that Congress had directed by statute that volunteer officers of the Army be tried only by a court-martial composed of volunteer officers. In light of this determination the Court concluded:

> "As to the officer to be tried there was no court, for it seems to us that it cannot be contended that men, not one of whom is authorized by law to sit, but on the contrary all of whom are forbidden to sit, can constitute a legal court-martial because detailed to act as such court by an officer who in making such detail acted contrary to and in complete violation of law. Where does such a court obtain jurisdiction to perform a single official function? How does it get jurisdiction over any subject-matter or over the person of any individual? The particular tribunal is a mere creature of the statute, as we have said, and must be created under its provisions." *Id.*, at 64.

In the same vein, the Court elsewhere stated: "A court-martial is the creature of statute, and, as a body or tribunal, it must be convened and constituted in entire conformity with the provisions of the statute, or else it is without jurisdiction." *Id.*, at 62. Because of the flaw

in the composition of the court-martial, a flaw which the Court considered determinative on the issue of the court-martial's jurisdiction, the Court affirmed a lower court's issuance of a writ of habeas corpus to secure the officer's release from military custody. Significantly, this writ was issued at a time when habeas corpus clearly lay only where the court-martial had "no jurisdiction over the person of the defendant or the subject-matter of the charges against him." *Id.,* at 69.[6] In *O'Callahan* the Court was not concerned with the composition of a particular court-martial, but with the fundamental question of the extent of Congress' constitutional power to establish court-martial jurisdiction over offenses committed by our servicemen. If the former issue goes to the jurisdiction of military tribunals, certainly the latter does.

### B

With this understanding of *O'Callahan,* I believe, contrary to the plurality's view, that the retroactive application of our holding there is required by our prior decisions in *Robinson* v. *Neil,* 409 U. S. 505 (1973), and *United States* v. *U. S. Coin & Currency,* 401 U. S. 715, 722–724 (1971). *Robinson* involved the retroactive application of the decision in *Waller* v. *Florida,* 397 U. S. 387 (1970), that the Fifth Amendment's guarantee, made applicable to the States through the Fourteenth Amendment, that no person should be put twice in jeopardy for the same offense barred an individual's prosecution for a single offense by both a State and a municipality of the State, that is, a legal subdivision of the State. *U. S. Coin & Currency* held retro-

---

[6] See also Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1209 (1970). The Court moved beyond the jurisdictional limitation on collateral attacks upon court-martial convictions in *Burns* v. *Wilson,* 346 U. S. 137 (1953). See Developments in the Law—Federal Habeas Corpus, *supra,* at 1215–1216.

active the Court's prior determination that the Fifth Amendment privilege against compulsory self-incrimination barred the prosecution of gamblers for failure to register and to report illegal gambling proceeds for tax purposes, see *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968).

In deciding whether to give retroactive effect to *Waller, Marchetti,* and *Grosso,* the Court rejected contentions that it should apply the three-prong test employed in cases such as *Stovall* v. *Denno,* 388 U. S. 293 (1967), *Desist* v. *United States,* 394 U. S. 244 (1969), and *DeStefano* v. *Woods,* 392 U. S. 631 (1968). In *U. S. Coin & Currency,* Mr. Justice Harlan, speaking for the Court, explained:

> "Unlike some of our earlier retroactivity decisions, we are not here concerned with the implementation of a procedural rule which does not undermine the basic accuracy of the factfinding process at trial. *Linkletter* v. *Walker,* 381 U. S. 618 (1965); *Tehan* v. *Shott,* 382 U. S. 406 (1966); *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Stovall* v. *Denno,* 388 U. S. 293 (1967). Rather, *Marchetti* and *Grosso* dealt with the kind of conduct that cannot constitutionally be punished in the first instance." 401 U. S., at 723.

The *Robinson* Court adopted essentially the same view of the *Waller* decision concerning the Double Jeopardy Clause and multiple prosecutions by different legal subdivisions of a single sovereign. See 409 U. S., at 508. In this case, too, we are concerned, not with "the implementation of a procedural rule," but with an unavoidable constitutional impediment to the prosecution of particular conduct.

In *O'Callahan,* as has been seen, the ultimate issue was the extent of the constitutional power that underlies

the jurisdiction of military tribunals. Where an offense lies outside the limits of that power, there exists just as much of a constitutional impediment to trial by court-martial as there existed to a civilian trial in *Marchetti* and *Grosso* due to the privilege against self-incrimination or in *Waller* due to the Double Jeopardy Clause. It cannot be forgotten that military tribunals are courts of limited jurisdiction. See *McClaughry* v. *Deming,* 186 U. S., at 63; *Ex parte Watkins,* 3 Pet. 193, 209 (1830). They cannot exercise authority which Congress has not conferred upon them, much less authority which Congress is without constitutional power to confer.[7] It is this fundamental principle that compels retroactive application of the decision in *O'Callahan.*

The plurality seeks to distinguish *U. S. Coin & Currency* and *Robinson* on the grounds that the former involved a right that prevented the offender from being tried at all and the latter a right that prevented "another trial from taking place at all," *ante,* at 679, whereas the underlying issue in this case is merely which jurisdiction can try offenses committed by servicemen. But these are distinctions without meaning; they

---

[7] Cf. Restatement of Judgments § 7, comment *b,* pp. 42–43 (1942): "There are many situations in which a court lacks competency to render a judgment. Thus, although a State has jurisdiction to grant a divorce of parties domiciled within the State, a decree of divorce rendered by a court which is not empowered to entertain suits for divorce is void. Similarly, a judgment rendered by a justice of the peace is void if under the law of the State such justices are not empowered to deal with the subject matter of the action; as, for example, where the action is one for tort and justices of the peace are given no power except in actions of contract. So also, where a court is given power to deal with actions involving no more than a designated amount, the statute limiting the amount is ordinarily construed not merely to make erroneous a judgment rendered by such a court in excess of its power, but to make such judgment void."

merely reflect the differences in the nature of the constitutional impediment to trial at issue in each case. The essential common thread tying these cases together is that each involved, at the least, a constitutional barrier to trial before the particular forum, regardless of the fairness of the procedures and the factfinding process of the relevant forum.

*U. S. Coin & Currency* swept broadly, to be sure, for it concerned a constitutional guarantee that effectively prevented any trial of the offender for the particular offense. But the nature of the Double Jeopardy Clause at issue in *Robinson* is such that the offender may be tried once for a particular offense by a court of a particular sovereign; it is the second prosecution for the same offense by another court of the same sovereign that that Clause clearly bars. Similarly here, a serviceman charged with a nonservice-connected offense is subject to trial for that offense by civil tribunals, but military tribunals lack the necessary constitutional power, at least in peacetime, to try such an offense. As was true in *Robinson*, this case involves a constitutional barrier to adjudication of a particular offense by a particular forum, yet in neither case does it follow that the offender is constitutionally entitled to go unpunished altogether. I fail to see, therefore, why different rules from those applied only recently in *Robinson* should be applied in this case.

There is, of course, the additional fact that the *Robinson* Court left open the question whether reasonable, official reliance upon a particular rule might properly be considered "in determining retroactivity of a nonprocedural constitutional decision such as *Waller*." 409 U. S., at 511.[8] And in this case the plurality, in attempt-

---

[8] In *Robinson* itself, the Court concluded that, in all events, there was no substantial element of reliance since "*Waller* cannot be said to have marked a departure from past decisions of this Court." 409 U. S., at 510.

ing to establish that *O'Callahan* was a " 'clear break with the past,' " *ante,* at 672, citing *Desist* v. *United States,* 394 U. S., at 248, and should therefore be applied only prospectively, does make much of the argument that substantial, justifiable reliance was placed on pre-*O'Callahan* law concerning the exercise of court-martial jurisdiction over servicemen, see *ante,* at 672–673. But I seriously question the relevance of any inquiry into official reliance on prior law where, as here, the issue is jurisdictional competency. Even assuming for the moment that *O'Callahan* completely reinterpreted the limits of Congress' power to confer jurisdiction on courts-martial, the decision involved the authoritative construction of a constitutional provision and no military tribunal could ever constitutionally have had more power than resided therein. But the real point is that *O'Callahan* did not mark a sharp, new departure from prior law.

The plurality acknowledges that *O'Callahan* did not involve the overruling of any prior precedent, *ante,* at 673. It is true, as the plurality indicates, that a number of prior decisions had suggested that "military status in itself was sufficient for the exercise of court-martial jurisdiction," *ibid.* Yet none of the cases upon which the plurality relies dealt in fact with a nonservice-connected offense committed by a serviceman in peacetime.[9] It is fair to say, in short, that until *O'Callahan*

---

[9] *Kinsella* v. *Singleton,* 361 U. S. 234 (1960), *Reid* v. *Covert,* 354 U. S. 1 (1957), and *Ex parte Milligan,* 4 Wall. 2 (1866), dealt with the exercise of military jurisdiction to try civilians, not servicemen. In each case, the Court held that the military lacked jurisdiction to try the civilians.

In *Grafton* v. *United States,* 206 U. S. 333 (1907), the Court held that a soldier who had been acquitted by a properly convened court-martial of a charge of homicide growing out of the shooting of a civilian while he was on guard duty in the Phillipine Islands could not thereafter be tried and convicted for the same offense by a civilian court of that Territory. *Johnson* v. *Sayre, 158* U. S. 109

the Court had not directly faced the issue of the service-connected nature of servicemen's offenses.

More importantly, perhaps, the *O'Callahan* Court's efforts to define the constitutional limits of the jurisdiction of courts-martial was hardly the beginning of such efforts by the Court. *O'Callahan* was but one of a series of steps taken by this Court since the conclusion of the Second World War to restrict military jurisdiction to its constitutionally appropriate limits. Thus, in *Toth* v. *Quarles,* 350 U. S. 11 (1955), the Court ruled that a discharged serviceman could not be tried by a court-martial for offenses committed while a member of the Armed Forces. Subsequently, it was established that courts-martial did not have jurisdiction to try offenses committed by civilian dependents accompanying military personnel

---

(1895), involved the court-martial conviction of a navy paymaster, whom the Court found to be in the naval service of the United States, for embezzling naval funds while serving on a receiving ship of the United States Navy. And in *Smith* v. *Whitney,* 116 U. S. 167 (1886), the Court was asked to order that a writ of prohibition be issued against a court-martial convened to try a naval pay inspector essentially for making various contracts not in the best interest of the Navy, for failing properly to enforce contractual agreements with the Navy, for compelling payment of illegal contractual claims against the Navy, and for failing to perform his duties and responsibilities. There can be little question that each of the offenses in *Grafton, Johnson,* and *Smith,* was "service connected" within the meaning of *O'Callahan.* Contrast *Relford* v. *Commandant,* 401 U. S., at 365.

Finally, *Coleman* v. *Tennessee,* 97 U. S. 509 (1879), involved the court-martial conviction of a soldier for the murder of a civilian woman. The particular circumstances of the murder are not apparent from the Court's opinion, but it is clear that the crime occurred during the Civil War, that is, during wartime, rather than during peacetime, see *id.,* at 516–517. *O'Callahan* did not clearly speak with respect to constitutional limits of court-martial jurisdiction during wartime since the offense at issue there had occurred in peacetime, and the plurality does not reach the issue of wartime offenses today, although it arguably is presented in No. 71–1398, see *ante,* at 685 n. 8.

serving overseas. *Kinsella* v. *Singleton,* 361 U. S. 234 (1960); *Reid* v. *Covert,* 354 U. S. 1 (1957). Finally, the Court held that civilians employed with the military overseas were not subject to court-martial jurisdiction. See *Grisham* v. *Hagan,* 361 U. S. 278 (1960); *McElroy* v. *Guagliardo,* 361 U. S. 281 (1960). This series of cases limited the reach of courts-martial to members of the Armed Forces; they did not require the Court to go on to define the breadth of offenses for which servicemen could be tried by courts-martial. Nonetheless, these cases and *O'Callahan* clearly were all pieces of the same cloth. Under these circumstances, I seriously doubt that retroactive application would do substantial violence to any legitimate, official reliance upon prior law [10]—even assuming that to be a valid consideration here.[11]

---

[10] With regard to the question of official reliance, it has been pointed out that as long ago as 1955 the Departments of Justice and Defense reached an agreement that at least federal offenses committed by servicemen off-post would fall within the jurisdiction of the Justice Department while those committed on-post would be within the jurisdiction of the Defense Department:

"The Departments of Justice and Defense have found it desirable to establish ground rules for determining the forum for trying a serviceman charged with a civil offense in violation of both military and federal law. In general, these rules, which were established by agreement between the Departments in 1955, give to the military department concerned the responsibility of investigating and prosecuting offenses committed by persons subject to the Uniform Code of Military Justice and involving as victims only those persons or their civilian dependents residing on the military installation in question." Duke & Vogel, The Constitution and the Standing Army: Another Problem of Court-Martial Jurisdiction, 13 Vand. L. Rev. 435, 455 (1960), citing Army Reg. 22–160, Oct. 7, 1955, implementing Memorandum of Understanding Between the Departments of Justice and Defense Relating to the Prosecution of Crimes Over Which the Two Departments have Concurrent Jurisdiction (July 19, 1955).

[11] Since the plurality opinion does not find it necessary to reach the Secretary's additional argument in No. 71–1398 that the auto

## II

MR. JUSTICE DOUGLAS, in his concurring opinion, contends that petitioner Gosa's case merits reargument to consider whether he should be denied relief because he failed to raise his jurisdictional objection before the court-martial that tried him. MR. JUSTICE DOUGLAS intimates that since the jurisdiction of the military to try petitioner was not initially contested, *"res judicata* [may now bar] inquiry" into the question of jurisdiction, *ante,* at 689. In my opinion, such an argument is clearly untenable, and hence reargument of petitioner Gosa's case is unnecessary.

### A

One of the most basic principles of our jurisprudence is that subject-matter jurisdiction cannot be conferred upon a court by consent of the parties. See, *e. g., American Fire & Casualty Co.* v. *Finn,* 341 U. S. 6, 17–18 (1951); *Industrial Addition Assn.* v. *Commissioner,* 323 U. S. 310, 313 (1945); *People's Bank* v. *Calhoun,* 102 U. S. 256, 260–261 (1880); *Cutler* v. *Rae,* 7 How. 729, 731 (1849).[12] An objection to the adjudicatory power of a tribunal may generally be raised for the first time at any stage of the litigation.[13] See, *e. g., Flast* v. *Cohen,* 392 U. S. 83, 88 n. 2 (1968); *United States* v. *Griffin,* 303 U. S. 226, 229 (1938); *Fortier* v. *New Orleans National Bank,* 112 U. S. 439, 444 (1884). Those principles are applicable even in the context of collateral attacks upon

---

theft there at issue was service connected because the offense took place while respondent was absent without leave during wartime, I think it inappropriate for me to express any view on that additional argument at this time.

[12] See also Restatement of Judgments § 7, comment *d,* p. 45 (1942).

[13] Contrast n. 15, *infra.*

court-martial proceedings, as is evident from this Court's decision in *McClaughry* v. *Deming,* 186 U. S. 49 (1902).

*McClaughry,* as previously indicated, involved a collateral attack upon the court-martial conviction of a volunteer officer who claimed that the Regular Army court-martial which had tried him had been constituted in violation of the relevant law and therefore was without jurisdiction. The volunteer officer had failed to raise this jurisdictional objection before the court-martial, and the military contended before this Court that "his consent waived the question of invalidity," *id.,* at 66. The Court rejected his contention, saying:

> "It was not a mere consent to waive some statutory provision in his favor which, if waived, permitted the court to proceed. His consent could no more give jurisdiction to the court, either over the subject-matter or over his person, than if it had been composed of a like number of civilians . . . . The fundamental difficulty lies in the fact that the court was constituted in direct violation of the statute, and no consent could confer jurisdiction over the person of the defendant or over the subject-matter of the accusation, because to take such jurisdiction would constitute a plain. violation of law." *Ibid.*

See also *id.,* at 68; *Givens* v. *Zerbst,* 255 U. S. 11, 20 (1921); *Ver Mehren* v. *Sirmyer,* 36 F. 2d 876, 879–880 (CA8 1929). Just as the silence of the accused in *McClaughry* could not confer jurisdiction on a court-martial of the Regular Army that was acting in excess of its statutory authority, so here the failure of Gosa to raise his jurisdictional objection before the court-martial could not have conferred upon that tribunal authority that constitutionally could not be conferred. Consequently, his

failure to object to the jurisdiction of the court-martial that tried him cannot be deemed fatal in this Court.[14]

## B

Moreover, even if *O'Callahan* were to be treated as merely a procedural rather than as a true jurisdictional decision, application of the doctrine of *res judicata* would nonetheless be entirely inappropriate in the context of petitioner Gosa's case since that action was brought by way of a petition for federal habeas corpus. Specifically, I must vigorously disagree with the suggestion, necessarily inherent in MR. JUSTICE DOUGLAS' opinion, that the doctrine of *res judicata* may have some place in the law of federal habeas corpus. In the past, this Court has indicated quite explicitly to the contrary:

> "At common law the doctrine of *res judicata* did not extend to a decision on *habeas corpus* refusing to discharge the prisoner. The state courts generally have accepted that rule where not modified by statute . . . ; and this Court has conformed to it and thereby sanctioned it . . . . We regard the rule as well established in this jurisdiction." *Salinger* v. *Loisel,* 265 U. S. 224, 230 (1924).

See *Fay* v. *Noia,* 372 U. S. 391, 423 (1963); *Darr* v. *Burford,* 339 U. S. 200, 214 (1950). Indeed, the rule was still

---

[14] MR. JUSTICE DOUGLAS would seem inclined to limit unwaivable jurisdictional flaws to instances in which an accused is "tried by a kangaroo court or by eager vigilantes . . . ," *ante,* at 689–690. But the presence or absence of adjudicatory power does not turn only on the fairness of the proceeding afforded by a particular forum; rather, as *McClaughry* adequately illustrates, jurisdictional competency in the context of courts of limited jurisdiction such as courts-martial necessarily involves the limits of the statutory and constitutional authority that provides the legal underpinnings for such tribunals. See also *Hiatt* v. *Brown,* 339 U. S. 103, 111 (1950); and n. 7, *supra.*

"well established in this jurisdiction" just a few months ago.[15]  See *Neil* v. *Biggers,* 409 U. S. 188, 190–191 (1972). The federal courts, to be sure, are not without means for

[15] For this reason, I believe that MR. JUSTICE DOUGLAS' reliance on *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371 (1940), is clearly misplaced insofar as petitioner Gosa's case is concerned.  *Chicot County* involved a question concerning the extent of indebtedness on certain municipal bonds which had previously been the subject of a federal proceeding to readjust indebtedness under the bankruptcy laws.  Following the readjustment proceeding, this Court declared unconstitutional the statute under which the proceeding had been brought, see *Ashton* v. *Cameron County District,* 298 U. S. 513 (1936).  In *Chicot County,* this Court then held that the original decree was not open to collateral attack as void by the nonconsenting bondholders who had had notice of the original readjustment proceeding but had there lodged no objection to the court's jurisdiction.

The decision can be seen as resting simply on the doctrine of *res judicata* to which the Court referred at points in its opinion, see *Chicot County, supra,* at 374–375.  The plaintiffs in the second action had had a full and fair opportunity to litigate the issue of jurisdiction in the first proceeding, but had failed to do so.  At the same time, there had been substantial action taken in reliance on the readjustment plan approved in the first proceeding.  New bonds had been sold to the Reconstruction Finance Corporation which had then purchased old bonds in exchange for them.  Under these circumstances it was both fair and proper to bar litigation of the jurisdiction issue in the collateral proceeding.  Cf. Restatement of Judgments § 10 and comment (1942).

But, as has been pointed out, the doctrine of *res judicata* has no place in federal habeas corpus; rigid rules restricting what questions are open to litigation on collateral attack are inappropriate in the context of judgments affecting personal liberty.  There are, of course, legitimate concerns with finality in criminal proceedings—both civilian and military—and with the orderly functioning of independent judicial systems.  But we have rules concerning exhaustion, waiver, and non-repetitious application to protect those concerns in the context of federal habeas corpus.

More generally, *Chicot County* is probably most appropriately interpreted as an early decision concerning the nonretroactive application of a particular decision, namely, *Ashton.*  Despite the Court's

dealing with repetitious applications for habeas corpus, see, *e. g., Salinger* v. *Loisel, supra,* at 231–232; 28 U. S. C. §§ 2244 (a), (b), or with applications raising questions previously litigated in this Court, see 28 U. S. C. § 2244 (c). But no such problems are presented here. Rather, a procedural problem arises in this case because petitioner Gosa failed to assert the "jurisdictional" defect, which he now raises, in seeking leave for a direct appeal to the Court of Military Appeals. This reflects, in my view, a failure on the part of Gosa to satisfy the exhaustion requirement, which is applied in the context of collateral attack on federal habeas corpus, thereby raising a substantial question whether he has waived his right to challenge the "jurisdiction" of the court-martial on habeas corpus.

The exhaustion doctrine evolved in the context of collateral attack on state criminal proceedings. See, *e. g., Ex parte Hawk,* 321 U. S. 114 (1944); *Ex parte Royall,* 117 U. S. 241 (1886). It generally requires state petitioners to utilize available state court remedies be-

---

resort at places to the rubric of *res judicata,* the presence of substantial reliance on pre-existing law clearly was an important consideration in the Court's decision not to allow the intervening decision in *Ashton* to be used to collaterally attack the original plan of readjustment. Furthermore, *Chicot County* was heavily relied upon by this Court when it gave the principles governing the retroactivity of new procedural constitutional rules full expression in *Linkletter* v. *Walker,* 381 U. S. 618, 625–626 (1965); and the case has been cited as a retroactivity decision on a number of occasions since *Linkletter,* see *Chevron Oil Co.* v. *Huson,* 404 U. S. 97, 106 (1971); *United States* v. *U. S. Coin & Currency,* 401 U. S. 715, 742–743 (1971) (WHITE, J., dissenting); cf. *United States* v. *Estate of Donnelly,* 397 U. S. 286, 293–294 (1970); *id.,* at 299–300 (DOUGLAS, J., dissenting). Viewed then as a precursor of the present-day retroactivity doctrine, *Chicot County* has no relevance for the threshold question whether Gosa is barred from raising his jurisdictional challenge on habeas corpus because he failed to present it in applying for leave to appeal to the Court of Military Appeals.

fore resorting to federal habeas corpus,[16] and thus serves both to ensure the orderly functioning of state judicial processes, without disruptive federal court intervention, and to allow state courts to fulfill their roles as co-equal partners with the federal courts in the enforcement of federal law, thus often eliminating the need for federal court action, and avoiding unnecessary friction between state and federal courts. These same considerations inhere in the context of collateral attack in federal court upon the judgments of military tribunals, which constitute a judicial system—a system with its own peculiar purposes and legal traditions—distinct from the federal judicial system much like the independent state judicial systems. Accordingly, this Court normally has required that military petitioners exhaust all available remedies within the military justice system. See *Noyd* v. *Bond,* 395 U. S. 683, 693 (1969); *Gusik* v. *Schilder,* 340 U. S. 128, 131–132 (1950).[17] At the time petitioner Gosa initiated this collateral attack he indeed had not exhausted a military remedy which was formerly available to him

---

[16] This rule does not, however, entitle the state courts to more than one opportunity to consider the same claim. Thus, in *Brown* v. *Allen,* 344 U. S. 443, 447 (1953), where the petitioners had presented their federal claims to the state courts on direct review, the Court said, "It is not necessary in such circumstances for the prisoner to ask the state for collateral relief, based on the same evidence and issues already decided by direct review . . . ." Indeed, if the exhaustion requirement were not restricted to providing all levels of the state courts with an opportunity to hear his federal claim, it would effectively bar state prisoners from ever reaching a federal forum in States in which an unlimited number of identical applications for state post-conviction relief are permitted. The exhaustion requirement does not demand such "repetitious applications to state courts." *Id.,* at 448–449, n. 3.

[17] But see *McElroy* v. *Guagliardo,* 361 U. S. 281 (1960); *Reid* v. *Covert,* 354 U. S. 1 (1957); *Toth* v. *Quarles,* 350 U. S. 11 (1955); *Noyd* v. *Bond,* 395 U. S. 683, 696 n. 8 (1969).

with respect to the claim he now asserts. But that certainly ought not to be the end of the inquiry.

In *Fay* v. *Noia,* 372 U. S. 391 (1963), the Court rejected the position that a state prisoner who had not pursued his state appellate remedies was barred from seeking federal habeas corpus because of his failure to exhaust, where the state appellate remedies were no longer available. The Court concluded, instead, that the exhaustion "requirement refers only to a failure to exhaust state remedies still open to the applicant at the time he files his application for habeas corpus in the federal court." *Id.,* at 399. The Court established that where there has been a failure to resort to a state court remedy and that remedy is no longer available, the availability of federal habeas corpus would turn on whether there was a deliberate bypass of the state process. *Id.,* at 438. In determining whether such a bypass has occurred, the Court said that "[t]he classic definition of waiver enunciated in *Johnson* v. *Zerbst,* 304 U. S. 458, 464—'an intentional relinquishment or abandonment of a known right or privilege'—furnishes the controlling standard." 372 U. S., at 439.

This Court has never considered the applicability of the nondeliberate-bypass rule in the context of military petitioners. *Fay* does not speak specifically with respect to such petitioners. Nonetheless, the considerations which argue in favor of tempering the exhaustion requirement with a rule of nondeliberate bypass in the context of state petitioners are equally applicable in the context of military petitioners. Certainly, military petitioners should be encouraged to raise their constitutional claims before available military tribunals in order to ensure the orderly functioning of the system of military justice, to avoid needless federal court action, and to allow military tribunals an initial opportunity to correct

their own errors. These interests are not subverted, however, by allowing a military petitioner to seek federal habeas corpus on the basis of a claim which he failed to raise before the military courts because he either was unaware of or did not otherwise willingly fail to raise that claim. As with state petitioners, the integrity of the exhaustion requirement is adequately protected by a rule prohibiting a deliberate bypass of an available military tribunal. A more stringent rule would serve only to bar presentation of valid federal claims without any countervailing justification for doing so.

On the facts of this case, I find it impossible to conclude that petitioner Gosa has waived his right to challenge the "jurisdiction" of the court-martial which convicted him of rape on the ground that the offense was not service connected. A valid waiver requires the "intentional relinquishment . . . of a known right." [18] At

---

[18] Nothing in this Court's recent decisions in *Tollett* v. *Henderson*, 411 U. S. 258 (1973), and *Davis* v. *United States*, 411 U. S. 233 (1973), suggests that a different standard should be applied in the context of this case. *Tollett* involved a collateral attack upon the validity of a guilty plea in light of racial discrimination in the composition of the state grand jury that had indicted Henderson, an objection that had not been raised at the time of the entrance of the plea. Because it was clear that neither Henderson nor his counsel was aware of the claim of discrimination at the time of the plea, the Court agreed that there had been no valid waiver of the claim in traditional terms, see 411 U. S., at 266, but the Court did not consider that determination dispositive in the peculiar context of a collateral attack upon a guilty plea. Rather, the Court ruled that "[t]he focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity," *ibid*. We, of course, do not deal here with the special problem of a collateral attack upon a guilty plea.

In *Davis*, the Court held that, for purposes of collateral attack, a petitioner had waived his objection to the composition of the grand jury that tried him because he had failed to raise the objection

the time of petitioner's 1967 application for review by the Court of Military Appeals the substantial "jurisdictional" issue that he now raises had yet to be addressed by this Court. While *O'Callahan* is, to be sure, properly viewed as one further step in the ongoing process of establishing the limits of court-martial jurisdiction, see *supra*, at 705–706, I do not think it follows that we should impose a rule of waiver so strict that it requires an individual petitioner to anticipate, at the time he appeals, a particular constitutional ruling of this Court that has yet to be rendered, especially not when the protection of a number of guarantees of the Bill of Rights is at stake. Moreover, where a new constitutional rule has been established following completion of regular proceedings in the military courts, the interests served by the exhaustion requirement can be fully satisfied by requiring that the subsequently identified claim first be presented to the military courts if a means, such as post-conviction relief,[19] exists for doing so. Cf. *Blair* v. *California*, 340 F. 2d 741 (CA9 1965); *Pennsylvania ex rel. Raymond* v. *Rundle*, 339 F. 2d 598 (CA3 1964). Yet if it is clear

---

before trial as Fed. Rule Crim. Proc. 12 (b)(2) expressly requires. Rule 12 (b)(2) specifies that "[d]efenses and objections based on defects in the institution of the prosecution or in the indictment . . . may be raised only by motion before trial" and that failure to do so "constitutes a waiver thereof." Confronted with a situation in which a specific rule provided "for the waiver of a particular kind of constitutional claim if it be not timely asserted," 411 U. S., at 239–240, the Court concluded that preservation of the integrity of the Rule demanded that its standard should govern in the context of a collateral attack upon an indictment. This case, however, involves no such "express waiver provision," *id.*, at 239, and consequently the general waiver principles established by this Court's previous decisions must control.

[19] See Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1234 (1970); cf. *Noyd* v. *Bond*, 395 U. S., at 695 n. 7.

that those courts would reject the claim, such post-conviction resort to the military courts would, of course, be futile and is therefore unnecessary, see *Gusik* v. *Schilder,* 340 U. S., at 132–133. This is now the case here, for during the pendency of this action the Court of Military Appeals, in *Mercer* v. *Dillon,* 19 U. S. C. M. A. 264, 41 C. M. R. 264 (1970), held that the "jurisdictional" principle announced in *O'Callahan* did not apply to cases decided before the date of the *O'Callahan* decision. It therefore became clear that it would be pointless to dismiss petitioner Gosa's application in order to allow him to present his claim to the military courts,[20] and consequently, his challenge to the "jurisdiction" of the court-martial that tried him is now properly before this Court.

Since I then cannot agree with the opinion of either the plurality or MR. JUSTICE DOUGLAS, I dissent.

---

[20] In any case, while his application for habeas corpus was pending in the District Court, petitioner Gosa filed a motion to vacate his conviction and sentence, on the basis of *O'Callahan,* in the Court of Military Appeals. Subsequent to the denial of relief in the District Court, the Court of Military Appeals, treating petitioner's motion as a petition for reconsideration, also denied relief. It did so, not on the basis that Gosa had waived the "jurisdictional" question by failing to present it on direct appeal, but on the basis of its previous decision in *Mercer* holding *O'Callahan* to be nonretroactive. 19 U. S. C. M. A. 327, 41 C. M. R. 327 (1970). Thus, in all events, it seems clear that Gosa has now adequately exhausted his military remedies and his previous bypass can no longer be deemed a waiver of the "jurisdictional" question, see *Warden* v. *Hayden,* 387 U. S 294, 297 n. 3 (1967).