Thomas R. DOOLEY, Appellant,

v.

Major General Robert R. PLOGER, Appellee.

Michael GNIP, USMC, Petitioner,

v.

Major F. A. McCAUGHAN, USMC, Respondent.

Nos. 73-1900, 73-2207.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 8, 1973.

Decided Feb. 12, 1974.

Richard Crouch, Robert E. Walker, Jr., Law Student, and Stephen C. Glassman, Arlington, Va. (Bernstein, Ward & Glassman, Arlington, Va., and David F. Addleston on brief), for Thomas R. Dooley and Michael Gnip.

Donald E. Shelton, Captain JAGC, U. S. Dept. of the Army, Robert L. Ashbaugh, Sp. Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., and J. Frederick Sinclair, Asst. U. S. Atty., on brief), for Major Gen. Robert R. Ploger and Major F. A. McCaughan.

Before WINTER, BUTZNER and FIELD, Circuit Judges.

WINTER, Circuit Judge:

These appeals both present the threshold question of whether the federal civilian courts should pass on the appropriateness of the exercise of court martial jurisdiction over certain narcotic offenses of military personnel allegedly lacking "service-connection" prior to the time that there are findings of fact and conclusions of law by the military courts on the jurisdictional issue of service-connection. These appeals also present the ultimate question of whether certain narcotic offenses of military personnel which were allegedly committed—and at least consummated—off-base, off-duty, and out-of-uniform, are "service-connected" within the purview of O'Callahan v. Parker,[1] and thus appropriately tried in the courts-martial. The Supreme Court has undertaken to decide the latter question by granting certiorari in Schlesinger v. Councilman.[2] If we were required to reach the ultimate question, we would stay the proceedings before us until the Supreme Court has decided the case on the merits, but we conclude that neither appellant can prevail on the threshold question. Because of this conclusion, as well as the special circumstances of each appellant, we proceed to final disposition now.

In Dooley v. Ploger (No. 73–1900), we hold that Sergeant Thomas R. Dooley's application for a writ of habeas corpus was premature. In his habeas petition, Sergeant Dooley sought pretrial release and freedom from military trial of the questions of his guilt and the service-connection of the alleged offenses (possession and sale of cocaine).[3]

1. 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

2. 414 U.S. 1111, 94 S.Ct. 839, 38 L.Ed.2d 737 (1973).

3. Although the record does not reflect the military proceedings subsequent to the denial of the writ, the briefs filed with us assert that Sergeant Dooley was convicted July 5, 1973 and sentenced, *inter alia*, to be confined at hard labor for one year and two months. The government asserts that the conviction was obtained on Dooley's plea of guilty, but under a reservation of his right to question the jurisdiction of the court-martial. Dooley makes no representation in that regard. In any event, Dooley is presently serving that sentence. We do not anticipate that the Supreme Court will decide *Schlesinger* earlier than late spring or early summer, 1974. If Dooley's case were held by us pending the outcome of *Schlesinger*, it might well become moot.

Before seeking relief from a district court, Sergeant Dooley must first exhaust his military remedies, at least to the extent that a military tribunal is given the opportunity to find the facts of service-connection, as well as guilt or innocence, and to impart its expert understanding of the impact of specific offenses on military capability.

█ In Gnip v. McCaughan (No. 73–2207), we hold that the district court was correct in refusing to enjoin Corporal Gnip's court-martial while it determined whether Gnip's alleged possession and sale of marijuana were service-connected. Before resorting to the federal civilian courts, Corporal Gnip, too, must litigate in the military court system the legal and factual questions of service-connection on which court-martial authority turns.[4]

We affirm in both appeals.

## II.

## DOOLEY

Army Sergeant Dooley's application for a writ of habeas corpus alleged that he was in military custody charged with violating Article 92 of the Uniform Code of Military Justice. Article 92 is a "catch all' provision which makes disobedience of a lawful general order or regulation criminal. In this case, Dooley was charged with violating Army Regulation 600–50, ¶ 4–2(7)(a)1, Change 1 (September 20, 1972), by possessing, selling, distributing or delivering a "controlled substance," i. e., 3.18 grams of cocaine.

Dooley's habeas petition stated that he was on active duty at Fort Belvoir, Virginia, but that the alleged possession and sale of cocaine occurred at an apartment complex parking area outside any military or other governmental enclave and not under military control. Dooley also alleged that the offense did not involve "a violation of military property," that he was properly absent from the Army base, that the alleged crime was committed during peacetime, that there was no connection between Dooley's military duties and the crime, that the alleged crime did not pose a threat to a military post, and that it was one traditionally prosecuted in a civilian court. Overall, the application concluded with the legal assertion that due to a lack of sufficient service-connection, the United States Army and the Department of Defense lacked jurisdiction to try Dooley by court-martial, thereby circumventing his right in an Article III court to indictment by a grand jury, trial by a petit jury, and release on bail.

The district court ordered Dooley's commanding general to answer, and attached to the answer were copies of the investigative reports and other documents which gave rise to the formal charges against Dooley. From them, it appeared that the Army was prepared to prove that on March 6, 1973, Private Lee Walter Coffey, a confidential informer and military police investigator assigned to Fort Meyers, Virginia, met Dooley at a gymnasium located on North Post, Fort Belvoir, for the purpose of purchasing a quantity of cocaine. Prior to the meeting, Coffey had met Dooley at the post gymnasium on several occasions, discussed narcotics with him, and had undertaken to "set up a buy" of three grams of cocaine for $50 per gram. At the March 6 meeting, Dooley asked Coffey if the latter had the money and was ready to deal. Coffey stated

---

4. Corporal Gnip's alleged offense was claimed to have occurred on June 29, 1973. His tour of duty with the Marines was to have expired July 13, 1973; but when the charges were brought, he was placed on hold pending court-martial and he was not discharged. Corporal Gnip sought to enjoin the convening of the court-martial by his complaint filed in the district court. When the district court denied relief and Gnip appealed, we enjoined the court-martial pending appeal. Following argument, we entered an order dissolving the injunction and indicating that we would affirm the district court before the Supreme Court acted in *Schlesinger.* We have no present knowledge whether the court martial has been held.

that someone else (military police investigator James J. McGivney) had the money and would be making the purchase. Dooley at first was reluctant to make a sale to McGivney, but after McGivney had been questioned and threatened by Dooley with death if he turned out to be an investigator or the police, Dooley agreed to make the sale but said that he would do so at an undisclosed location to which he would lead Coffey and McGivney. Coffey and McGivney followed Dooley to the apartment complex parking area, and there Dooley handed Investigator McGivney a cellophane bag containing a white substance and suggested that McGivney sample it. After simulating sampling, McGivney indicated that he was satisfied, and Dooley handed over two more cellophane bags. Dooley demanded $50 per bag and he was paid that sum. Dooley then invited Coffey and McGivney to Dooley's apartment, where he offered them a marijuana cigarette and offered to sell marijuana at $115 per pound. A laboratory test confirmed that the white substance in each of the three cellophane bags was cocaine.[5]

### III.

### GNIP

Gnip's case was instituted by a complaint for a preliminary and permanent injunction in which it was alleged that Gnip was a member of the Marine Corps who would have completed his four-year tour of duty on July 13, 1973, but that on June 29, 1973, he was charged with unlawful possession of marijuana, unlawful transfer of marijuana, and unlawful sale of marijuana, all at Apartment No. 3, 239 Fourth Avenue, Quantico Town, Virginia. As a result of the pendency of the charge, Gnip was not discharged as scheduled. Gnip alleged that his possession, transfer and sale of marijuana occurred when he was legally away from the base (Quantico), was not in uniform, was not in the presence of anyone in uniform, was not on any military installation, was off-duty, and was not engaged in the performance of any duty relating to the military. The complaint averred that although the sale was made to another Marine, at the time of the sale he was not in uniform and was not on a military installation or any other property subject to military jurisdiction. Further, it was alleged that under the holding in O'Callahan v. Parker, supra, the crimes charged were not service-connected and, hence, that Gnip was not subject to court-martial proceedings in which he would be deprived of the right available in an Article III court to indictment by a grand jury and trial by a petit jury.

Although Gnip's brief on appeal sets forth detailed statements of the circumstances under which the crimes were committed, his statements lack record support, and they are not admitted by the government. Suffice it to say that, unlike Dooley's case, there is nothing in the record to indicate where the alleged sale of marijuana to the undercover military agent was negotiated or arranged, or whether there were other negotiations between the parties prior to the alleged sale and, if any, where they were conducted. Because the government filed no response to Gnip's motion for a preliminary injunction and a hearing thereon was held before an answer to the complaint was due, Gnip's allegations have not been answered or amplified by the government. At the hearing on the motion for preliminary injunction, the district court denied the motion and concluded to dismiss the complaint.

### IV.

Dooley sought habeas corpus before his military trial was held; not after his military conviction was final. His petition thus presents the question of whether the long established exhaustion requirement articulated in Gusik v.

---

5. In his brief in this court, Dooley offers to stipulate the facts set forth in the answer, but only *"for purposes of this appeal."* (Emphasis added.)

Schilder[6] and Noyd v. Bond [7] applies to servicemen challenging a court-martial's subject matter jurisdiction on grounds of service-connection, or whether the implied exception to the exhaustion requirement found in cases denying court martial jurisdiction over civilians,[8] should be extended to cases raising non-frivolous claims of a lack of service-connection under O'Callahan v. Parker.[9]

*Gusik* and *Noyd* held that before members of the armed services could obtain federal habeas corpus they generally had to exhaust remedies available in the military courts affording equivalent relief. Those cases' restatement of the general rule requiring exhaustion of military remedies [10] rested primarily on the ground that "[i]f an available procedure has not been employed to rectify the alleged error which the federal court is asked to correct, any interference by the federal court may be wholly needless. The procedure established to police the errors of the tribunal whose judgment is challenged may be adequate for the occasion. If it is, any friction between the federal court and the military or state tribunal is saved." [11] In *Noyd*, the Court found support for the exhaustion requirement not only in the policy of avoiding needless friction, but also in the unfamiliar special circumstances of military life.[12]

After *Gusik*, and contemporaneously with *Noyd*, the Supreme Court decided O'Callahan v. Parker,[13] which held that court-martial jurisdiction over military personnel is limited to offenses which are service-connected. *O'Callahan* set forth some criteria for determining whether a crime is service-connected and later in Relford v. Commandant,[14] the Supreme Court attempted to categorize the factors indicating the presence or lack of service-connection. Finally, last term, in Gosa v. Mayden,[15] the Court grappled inconclusively with the question of whether *O'Callahan* should be applied retroactively. In the course of his plurality opinion arguing against retroactive application, Mr. Justice Blackmun characterized *O'Callahan* as a holding that "the exercise of jurisdiction [by the court-martial] was not appropriate . . . [but not as a holding] that a military tribunal was and always had been without authority to exercise juris-

---

6. 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950).

7. 395 U.S. 683, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969).

8. *E. g.*, McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960), Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

9. 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) amplified and categorized the factors relevant to a holding of service-connection.

10. *See* Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1332–36 (1970).

11. 340 U.S. at 132, 71 S.Ct. 149, 95 L.Ed. 146, *quoted in* 395 U.S. at 693–694, 89 S.Ct. at 1882.

12. In reviewing military decisions, we must accommodate the demands of individuals' rights and the social order in a context which is far removed from those which we encounter in the ordinary run of civilian litigation, whether state or federal. In doing so, we must interpret a legal tradition which is radically different from that which is common in civil courts.

It is for these reasons that Congress, in the exercise of its power to "make Rules for the Government and Regulation of the land and naval Forces," has never given this Court appellate jurisdiction to supervise the administration of criminal justice in the military. When, after the Second World War, Congress became convinced of the need to assure direct civilian review over military justice, it deliberately chose to confide this power to a specialized Court of Military Appeals, so that disinterested civilian judges could gain over time a fully developed understanding of the distinctive problems and legal traditions of the Armed Forces. 395 U.S. at 694, 89 S.Ct. at 1883.

13. 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), *noted in* The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 212 (1969).

14. 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

15. 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973).

diction over a nonservice connected offense." [16]

Dooley argues that the exhaustion requirement does not apply to cases challenging a military court's jurisdiction. For this proposition, he relies on the Supreme Court decisions denying court-martial jurisdiction over civilian dependents,[17] employees,[18] and former servicemen.[19] Those cases, which established military status as a prerequisite to court-martial jurisdiction, were decided without requiring the petitioners to present their claims in the military courts. In arguing the effect of the civilian cases, Dooley relies heavily on Mr. Justice Harlan's brief characterization of them in a footnote in *Noyd*:

> The cited cases held that the Constitution barred the assertion of court-martial jurisdiction over various classes of civilians connected with the military, and it is true that this Court there vindicated complainants' claims without requiring exhaustion of military remedies. We did so, however, because we did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented. Moreover, it appeared especially unfair to require exhaustion of military remedies when the complainants raised substantial arguments denying the right of the military to try them at all.[20]

Dooley thus argues that exhaustion of military remedies is excused regardless of which jurisdictional prerequisite of the military courts is attacked, the military status of the defendant or the "service-connection" of the offense.

■ If the correctness of Dooley's characterization of his claim as "jurisdictional" were determinative of whether the exhaustion doctrine applied, a closer examination of *O'Callahan* and the debate between the plurality [21] and one of the dissenting opinions [22] in *Gosa v. Mayden* to determine the "jurisdictional" status of Dooley's claim would be necessary. But we do not think the examination is warranted. The doctrine of exhaustion of remedies is a flexible, discretionary one grounded upon several policies.[23] Its application, including application to a jurisdictional challenge, turns upon consideration of those policies in the light of the questions raised by the case, as well as any extraordinary circumstances calling for early judicial decision. There is no general exception to the exhaustion requirement for jurisdictional challenges; here, as in cases where the challenge may not be termed "jurisdictional," it is important to respect the orderly processes of the military court system, to avoid needless friction, and to have the facts developed and the law interpreted by the expert adjudicatory tribunals charged in the first instance with responsibility for offenses of members of the armed services.[24]

The opinions in the civilian cases did not explain their excusal of exhaustion.

16. 413 U.S. at 677–678, 93 S.Ct. at 2935.

17. Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

18. Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960), McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960).

19. United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

20. 395 U.S. at 696 n. 8, 89 S.Ct. at 1884.

21. 413 U.S. at 667, 93 S.Ct. 2926, 37 L.Ed.2d 873 (Blackmun, J.).

22. 413 U.S. at 693, 93 S.Ct. 2926, 37 L.Ed.2d 873 (Marshall, J.).

23. *See* Smith v. United States, 199 F.2d 377, 381 (1 Cir. 1952) (Magruder, J.), L. Jaffe, Judicial Control of Administrative Action, ch. 11 (1965), K. Davis, 3 Administrative Law § 20.03 p. 69 (1958).

24. *See* Jaffe, supra, 436–37; Davis, supra, § 20.03 *esp.* p. 69. *Cf.* NLRB v. Hearst Publications, 322 U.S. 111, 130–132, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (question of whether newsboys were "employees" within the NLRA and thus under NLRB *jurisdiction* was for the NLRB).

Thus, analysis of the precedential effect of those decisions on the immediate controversy depends on Justice Harlan's brief footnote explanation and general exhaustion doctrine. While both Dooley and the petitioners in the civilian cases challenged "the right of the military to try them at all" under the constitutional grant of court-martial jurisdiction,[25] this type of claim is present in every constitutional and jurisdictional attack.[26] The significant distinction between the civilian cases and the instant appeals is that here "the expertise of military courts [does] exten[d] to the consideration of constitutional claims of the type presented." Resolution of the civilian cases principally involved traditional questions of constitutional law.[27] Unlike Dooley's claim, the civilian cases involved no disputed questions of fact and no questions on which the expert opinion of the military courts would be helpful.[28] Resolution of the *O'Callahan* questions presented by these appeals depends for the most part on the fact-finding process—which will determine the circumstances under which any offense has been committed—and on a judgment of the impact of the offenses on the combat effectiveness of the armed forces. Expert understanding of the special circumstances of military life obviously would influence what facts are found from the evidence and what significance is attached to them. Thus, in the immediate case, unlike the civilian cases, the expertise of the military courts is most relevant to constitutional decision.

Dooley is a serviceman and there is at least a claim that the negotiations allegedly resulting in an illegal sale of cocaine occurred on a military reservation and that the sale was made to other military personnel. There are, therefore, possible service-connections which may appear upon development of the facts. Dooley's tendered stipulation falls short of providing the certainty that is necessary in order to arrive at an informed judgment as to the effect that *O'Callahan* has on his case. The proper tribunal to determine the operative facts is a military tribunal which also has the expertise to express a view, once the operative facts are developed, of the effect of the commission of the crime, if guilt is found, on the morale and efficiency of future operations of the military. We hold, therefore, that the district court properly declined to issue the writ and that Dooley must exhaust available military remedies, especially fact-finding remedies, before he may properly resort to a district court.

We find unpersuasive the contrary decision in Moylan v. Laird,[29] as did the Third Circuit in Sedivy v. Richardson.[30] In accord with our views are Mascavage v. Richardson,[31] Diorio v. McBride,[32] and Hamlin v. Laird.[33]

In arriving at this holding, we are fully mindful of a limitation on the doctrine of exhaustion. While exhaustion applies as long as there is an available, unused remedy which may result in relief. *Gusik,* supra, we have never re-

25. Art. I § 8 cl. 14.

26. *See* Davis, supra, § 20.02 p. 65, § 20.03 p. 69; Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 49–52, 58 S.Ct. 459 82 L.Ed. 638 (1938) (Brandeis, J.) (exhaustion required despite challenge to constitutional "jurisdiction" of NLRB) *discussed in* Jaffe, supra, 433–37 (accenting importance of factual development to resolution of Bethlehem's claim) ; and Davis, supra, § 20.02 pp. 58–59, § 20.03 p. 70.

27. The principal bases of the court's decisions in the civilian cases were: (1) linguistic analysis of the constitutional term "land and naval Forces;" (2) narrow construction of congressional authority under Art. I, § 8, cl. 14, because the jurisdiction of military courts encroaches on that of the civilian Article III courts which accord the individual fuller protections; (3) narrow construction of court-martial jurisdiction because historical analysis reveals grudging and halting acceptance of court-martial jurisdiction.

28. *Cf.* Jaffe, supra, 436.

29. 305 F.S. 551 (D.R.I.1969).

30. 485 F.2d 1115, 1118 (3 Cir., 1973).

31. (D.C.Cir., April 23, 1973).

32. 306 F.Supp. 528 (N.D.Ala., 1969) aff'd, 431 F.2d 730 (5 Cir. 1970).

33. 371 F.S. 806 (S.D.Ga., 1973).

quired exhaustion where the outcome would predictably be futile.[34] If, as Dooley contends, the United States Court of Military Appeals has held in United States v. Rose,[35] and other cases,[36] that *any* delivery of narcotics by one serviceman to another is *per se* service-connected, whether on-base or off-base and irrespective of other circumstances, we would not require Dooley to prosecute his case to that court. Nonetheless, Dooley would be required to exhaust the fact-finding mechanisms of the system of military justice. But once the factual basis of possible service-connections was established, Dooley would be excused from further exhaustion of military remedies and could seek a writ of habeas corpus from a district court.

## V.

Most of what we have said with respect to Dooley is applicable to Gnip.[37] Dooley sought habeas corpus prior to court-martial; Gnip filed a complaint seeking a preliminary and permanent injunction against being tried by a court-martial. Gnip did not allege sufficient facts to determine the service-connection of the charges against him, and the district court dismissed his complaint before those facts could be developed.

The district court's dismissal was strictly in accord with the decision in Sedivy v. Richardson,[38] which, correctly we think, vacated the district court's permanent injunction prohibiting military trial of an army sergeant on charges that he unlawfully possessed amphetamines and marijuana in violation of Articles 92 and 134 of the Uniform Code of Military Justice. Noticing first, but not deciding, that there was a question of jurisdiction under the federal question jurisdiction because of the absence of the prerequisite $10,000 in controversy,[39] the court held that the district court should not have made findings and decided the *O'Callahan* issue because it "should have required the appellee [the accused sergeant] to exhaust remedies in the military court system and not have interfered with its orderly process."[40] We express no view on whether federal question jurisdiction was properly invoked by Gnip, but we affirm the district court's dismissal of his complaint on the authority of *Sedivy*. If and when Gnip is convicted and has exhausted his available, effective military remedies, he may litigate the *O'Callahan* question in the district court.

Affirmed.

34. *See, e. g.,* Evans v. Cunningham, 335 F.2d 491 (4 Cir. 1964), Rowe v. Peyton, 383 F.2d 709, 711 (4 Cir. 1967) (in banc).

35. 19 U.S.C.M.A. 3, 41 C.M.R. 3 (1969).

36. United States v. Beeker, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969); United States v. Castro, 18 U.S.C.M.A. 598, 40 C.M.R. 310 (1969). Rainville v. Lee, —— U.S.C.M.A. —— (No. 72–42) (September 13, 1973).

37. It would appear that Gnip has a somewhat greater individual interest in early decision. His denial that the alleged marijuana offense is service-connected is an attack, not only on the jurisdiction of the military courts, but also on any exercise of authority by the military at all. It appears that Gnip would be a civilian but for the charge of an allegedly service-connected offense, since this is apparently the sole basis for extending his military obligation. Gnip's interest, however, goes to early resolution of his claim, not to the forum—military or civilian—in

which that resolution is made. Nonetheless, we would anticipate that any decision on the appropriateness of exercising court-martial jurisdiction rather than civilian state or federal court jurisdiction would be made in light of Gnip's special and arguably attenuated relationship with the Marines. See Mr. Justice Minton's dissenting opinion in United States ex rel. Toth v. Quarles, 350 U.S. 11, 44, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (arguing that by virtue of a statute somewhat analogous to the "extension" statute here, the prisoner there still bore military status for purposes of court-martial jurisdiction) apparently rejected by the majority. 350 U.S. 11, esp. 13, 22, 23, 76 S.Ct. 1, 100 L.Ed. 8.

38. 485 F.2d 1115 (3 Cir., June 21, 1973).

39. *See especially* Judge Adam's concurrence in *Sedivy,* 485 F.2d 1122.

40. 485 F.2d at 1121.